IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS


**MARSHA SUE PEARSON,**

      Plaintiff,

**v.**                              **CIVIL ACTION NO.: 2:14-CV-26**
                                           **(BAILEY)**

**CAROLYN W. COLVIN,**
**Acting Commissioner of Social Security,**

      Defendant.


## REPORT AND RECOMMENDATION

## I.   INTRODUCTION

On April 17, 2014, Plaintiff Marsha Sue Pearson ("Plaintiff"), by counsel Brian D. Bailey, Esq., filed a Complaint in this Court to obtain judicial review of the final decision of Defendant Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g). (Compl., ECF No. 1). On June 20, 2014, the Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer, ECF No. 6; Admin. R., ECF No. 7). On July 2, 2014 and July 30, 2014, Plaintiff and the Commissioner filed their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J. ("Def.'s Mot."), ECF No. 14). On August 7, 2014, Plaintiff filed her Response. ("Pl.'s Resp.," ECF No. 16).

On September 2, 2014, Plaintiff filed a Motion to Proffer Evidence and brief in support thereof. ("Pl.'s Mot. Prof.," ECF No. 17; "Pl.'s Br. Prof.," ECF No. 17-1). On September 16, 2014,

1

the Commissioner filed her Response to Plaintiff's Motion to Proffer. ("Def.'s Resp. Prof.," ECF No. 18). Plaintiff filed her Reply on September 18, 2014. ("Pl.'s Reply Prof.," ECF No. 19). On October 17, 2014, Plaintiff filed a supplemental brief in support of her Motion to Proffer. ("Pl.'s Suppl. Br. Prof.," ECF No. 23). On October 27, 2014, oral argument was heard by the undersigned Magistrate Judge. At the hearing, Brian Bailey, counsel for Plaintiff, and Theresa Casey, Assistant United States Attorney, participated by telephone. Following the hearing and a review of the Motions by the parties and the Administrative Record, the undersigned now issues this Report and Recommendation to the District Judge.

## II. <u>PROCEDURAL HISTORY</u>

On May 17, 2011, Plaintiff protectively filed her first application under Title XVI of the Social Security Act for Supplemental Security Income ("SSI") and under Title II and Part A of Title XVIII of the Social Security Act for Disability Insurance Benefits ("DIB"), alleging disability that began on November 15, 2010. (R. 125-34). The claim was denied initially on June 30, 2011 (R. 76) and denied again upon reconsideration on October 13, 2011 (R. 87). On October 26, 2011, Plaintiff filed a written request for a hearing (R. 90), which was held before United States Administrative Law Judge ("ALJ") Regina Carpenter on November 15, 2012, in Morgantown, West Virginia. (R. 40). Plaintiff, represented by counsel, Harold Bailey, Esq., appeared and testified, as did Timothy Mahler, an impartial vocational expert. (Id.). On November 26, 2012, the ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within the meaning of the Social Security Act. (R. 22). On March 13, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (R. 1). On August 27, 2014, the Secretary found Plaintiff disabled as of November 27, 2012, based on a subsequently filed claim. (Pl.'s Mot. Prof. at 1).

# III.   BACKGROUND

## A.   Personal History

Plaintiff was born on July 7, 1968, and was forty-two years old at the time she filed her first Social Security claim. (R. 125-34). She completed high school in 1986 (R. 159) and has prior work experience as certified nursing assistant (R. 159). She was married at the time she filed her initial claim and nothing in the record reflects that her marital status had changed during the time period of this review. (R. 49, 135). She has no dependent children. (R. 49, 135). Plaintiff alleges disability due to COPD, diabetes, hypertension, arthritis and sleep apnea. (R. 158).

## B.   Medical History

### 1.   Medical History Pre-Dating Alleged Onset Date of November 15, 2010

On March 31, 2009, Plaintiff presented for treatment with her primary care physician, Lance Dubberke, M.D. of Shinnston Healthcare. Plaintiff complained of a cough she experienced for over a month. She had previously gone to the emergency room and urgent care and received antibiotics but she was still coughing and wheezing. Plaintiff's treatment history included depression and treatment with Zoloft and Lexapro. He instructed her to discontinue Zoloft. Dr. Dubberke's examination showed diffuse wheezing throughout but no retractions. His diagnosis was acute asthmatic bronchitis and depression history. He gave her a shot of Solu-Medrol, a steroid, prescribed Prednisone and gave her Avelox and Duo-Neb for the asthmatic bronchitis. He prescribed Seroquel and Lexapro for depression. (R. 299).

Chest x-rays taken at United Hospital Center on April 4, 2009, revealed no abnormality of her heart or lungs (R. 308) and x-rays taken on April 6, 2009, reveal clear lung fields and no acute process identified in the chest. (R. 304). The April 4, 2009, x-ray showed no change from a February 23, 2009, film taken of Ms. Pearson's chest. (R. 309).

3

On June 11, 2009, Plaintiff presented to Dr. Dubberke following a hospitalization for asthma. She was coughing and wheezing and using her inhaler once a day. She was still smoking. Other conditions included depression. She reported that her mood had been stable but that she had quit taking Seroquel because it made her feel "funny." She also had some cellulitis in her left leg that went up her leg. She had been given a prescription for Keflex, an antibiotic, which she claimed made a big difference. Dr. Dubberke advised her to finish the Keflex to treat the cellulitis, prescribed Prednisone for treatment of her asthma with acute exacerbation, strongly recommended that she discontinue tobacco and increased her Zoloft prescription to treat depression. (R. 298).

On October 12, 2009, she presented to Dr. Dubberke following her recent treatment for pneumonia at Medbrook Medical Associates, Inc. She was still coughing and wheezing on a daily basis and smoking about a pack a day. She reported a history of depression which was being treated with Zoloft. She discontinued the use of Seroquel. She reported that she was working. She claimed that her concentration was okay, she was sleeping fine and her mood was okay, but reported getting a little irritable. Dr. Dubberke treated her acute asthmatic bronchitis with Prednisone. Her depression was stable and he continued treatment with Zoloft. (R. 297).

Dr. Dubberke saw Ms. Pearson on October 26, 2009. She presented for a follow-up for treatment of her COPD, asthma exacerbation. She reported feeling ten percent better but was still coughing. He treated her for acute chronic obstructive pulmonary disease exacerbation by placing her on Prednisone with a follow-up visit in a week. (R. 296). Chest x-rays taken at United Hospital Center on October 26, 2009, revealed well expanded and clear lungs with an impression of a normal chest. (R. 303). On November 2, 2009, Ms. Pearson presented for her follow-up. (R. 296).

Ms. Pearson was treated at Medbrook on February 5, 2010 for complaints of pain in her right knee. (R. 227). She reported smoking two packs of cigarettes per day. She was diagnosed as

having a Baker's cyst in her right knee, was prescribed Darvocet and was instructed to return in two weeks for a follow-up appointment. (R. 228). X-rays of her right knee were unremarkable. (R. 230). Although there was no evidence of deep venous thrombosis, a Baker's cyst measuring 2.5 x 3.0 x 2.1 in the popliteal fossa was observed. (R. 231).

On February 16, 2010, Ms. Pearson presented to Dr. Dubberke with complaints of leg pain. Upon examination, Dr. Dubberke diagnosed Plaintiff with a Baker's cyst, asthma with acute exacerbation and an unspecified vitamin D deficiency. (R. 294). He prescribed medication for treatment, noted that cost was a huge issue and recommended that she quit smoking. He referred her to ortho for treatment for the Baker's cyst. He prescribed her vitamin D tablets. (R. 295).

Dr. Waxman, an orthopedic surgeon, saw Plaintiff on February 18, 2010, on a referral from Dr. Dubberke. Her chief complaint was pain in her right knee that had been bothering her for couple of months. She stated that the pain had gotten worse in the last couple of weeks and that the pain in her knee ran down her leg to her foot. She complained of numbness and tingling in the foot. (R. 210). She reported taking the following medications on the date of the examination: Zoloft, Allegra, Zantac, Singulair, metformin, theophylline, Prednisone and vitamin D. She was working as a nursing assistant at Clarksburg Nursing and Rehabilitation Center at the time. She reported smoking a pack of cigarettes a day. (R. 210). Dr. Waxman reviewed x-rays taken at United Hospital Center on February 5, 2010. He noted perhaps a slight narrowing of the medial compartment with no ostophytes. His impression was early osteoarthritis of the medial compartment with possible torn medial meniscus. He recommended an MRI scan and scheduled the same for the following morning. (R. 211).

Ms. Pearson had a follow-up visit with Dr. Dubberke on February 22, 2010. She reported that she felt better with less cough. He continued the course of treatment for her asthma and asked

her to cut back on tobacco by fifty percent, if she was able. (R. 293).

On February 24, 2010, Plaintiff presented for a follow-up visit with Dr. Waxman. She reported that Dr. Dubberke had started her on Mobic and she reported that her knee was feeling better, although it still popped at times. (R. 212). Dr. Waxman read the MRI scan taken on February 19, 2010, and noted a visible cyst about 2.5 cm inside the medial head of the gastrocnemius. His treatment plan provided that she continue her Mobic and he encouraged her to lose weight to help preserve her knee joint. He noted that her Baker's cyst symptoms were getting better and therefore, did not recommend intervention. He advised that if the pain in her knee worsened, he could drain and inject the cyst. However, since he could not palpitate the cyst in his office, he suggested a radiological treatment such as ultrasound guided aspiration/injection of her cyst. He authorized the claimant to return to work as a nursing assistant and to return as needed in the future. (R. 212).

On April 6, 2010, Ms. Pearson presented to Dr. Dubberke complaining of a cough. She reported that her symptoms were better, but that she still coughed and wheezed daily. (R. 288). His assessment included asthma, osteoarthritis and overweight. He recommended that she lose weight, discontinue tobacco and referred her to a dietitian. He asked her to follow-up with her orthopedic physician for her knee pain issues. (R. at 288-89).

Ms. Pearson returned for a follow-up appointment with Dr. Waxman on April 22, 2010, with complaints of left knee and leg pain. Dr. Waxman reported that Plaintiff was complaining of right knee pain with symptoms that included locking and popping and posterior knee pain. She complained of pain at times when she walked and all of the time at rest. She reported taking Mobic, ibuprofen and Darvocet for her pain. (R. 213). Dr. Waxman's impressions were that Ms. Pearson had mild osteoarthritis in the right knee and a Baker's cyst of the posterior medial right knee. He instructed her not to take Mobic and Ibuprofen at the same time to avoid issues with her stomach.

He scheduled her for an ultrasound and guided aspiration injection of her cyst. (Id.).

On April 28, 2010, an aspiration of Ms. Pearson's right popliteal cyst was successfully performed. 2.5 cc of clear yellow fluid was aspirated and was determined to be non-malignant. (R. 344-45).

On September 7, 2010, Plaintiff was seen at Urgent Care complaining of chest congestion and wheezing. She was diagnosed with bronchitis, prescribed medication and instructed to return for a follow-up in three to four days if there was no improvement in her condition. (R. 218). X-rays taken on that day revealed normal PA and lateral chest films. (R. 219).

On October 27, 2010, Ms. Pearson was seen at Urgent Care for a work related physical. She identified that she previously had diabetes, operations, other injuries, asthma and a hernia. She weighed 289 pounds. No other medical conditions or treatments were described and she denied having any mental disease. (R. 216).

Ms. Pearson was referred to Dr. Rajjoub, M.D., a pulmonologist, by Dr. Dubberke for treatment for her chronic bronchitis, coughing and wheezing. Dr. Rajjoub saw Ms. Pearson on April 20, May 3, September 22, November 9 and November 30, 2010. At these appointments, her weight remained a constant 272 pounds. Dr. Rajjoub's April 20, 2010 notes reflect that Ms. Pearson "thinks she is being exposed to mold." He further states that Plaintiff had been smoking for over twenty-five years and smoked one pack per day. (R. 242). Diagnoses included: COPD, shortness of breath, cough, wheezing, asthma, EDS, obesity and toxic effect, tobacco. (R. 241).

On May 3, 2010, Dr. Rajjoub diagnosed Ms. Pearson's conditions as asthma, chest pain, coughing, wheezing and toxic effects, tobacco. (R. 240). As on her previous visit, Ms. Pearson was advised to quit smoking. (R. 240). Studies performed on that day revealed a mild airway obstruction and a low normal lung volume in combination with significant obstruction which

suggested a probable concurrent restrictive process. (R. 246).

Plaintiff followed-up with Dr. Rajjoub on September 22, 2010. Her diagnoses included: COPD, shortness of breath, EDS, snoring, fatigue and obesity. She was again advised to quit smoking. (R. 239).

On October 11, 2010, Ms. Pearson participated in a sleep study. The study showed a good response to a nasal CPAP machine. Her diagnosis was obstructive sleep apnea, excessive daytime sleepiness, loud/bothersome snoring, period movement disorder and nocturnal hypoxia. Dr. Rajjoub recommended a nasal CPAP machine. (R. 248-65).

On November 9, 2010, Ms. Pearson again met with Dr. Rajjoub. She was diagnosed with OSAS, EDS, fatigue and snoring. She was instructed to return in three weeks. She returned on November 30, 2010. Her diagnosis at that time was COPD, shortness of breath, coughing, wheezing and toxic tobacco. She was again advised to quit smoking. (R. 237-38).

### 2. Medical History Post-Dating Alleged Onset Date of November 15, 2010

On or about November 22, 2010, Plaintiff was treated at Medbrook. X-rays were taken at the request of Dr. Dubberke based on his diagnosis of acute asthmatic bronchitis. (R. 234).

On January 18, 2011, Plaintiff was admitted to United Hospital Center by Dr. Dubberke with a chief complaint of shortness of breath. Dr. Dubberke had seen her a week or two prior for treatment of an asthma attack. He had placed her on steroids and nebulizers and reported that she had gotten worse. Plaintiff had shortness of breath after walking fifty feet from his waiting room to the examination room. (R. 272). His assessment was acute asthmatic bronchitis following failed outpatient therapy with tachypnea and dyspnea on exertion. Her additional diagnoses were depression and hypertension. (R. 273). After inpatient medication, her wheezing was markedly improved with good air movement and no distress. Her vitals were stable. She was discharged on

January 20, 2011, with no complaints whatsoever and "actually felt better." (R. 270). Her discharge instructions provided that she was to follow-up in the clinic in the next one to two weeks. Further, she was advised not to smoke whatsoever. (R. 271).

Chest x-rays were taken on January 18, 2011 and compared to chest x-rays from November 22, 2010. No significant changes were noted and the impression was no acute cardiopulmonary process appreciated. (R. 276). The 2010 x-ray ordered by Dr. Dubberke noted a normal chest and clear lungs with no significant change since October 2009. (R. 317).

On February 3, 2011, Ms. Pearson was seen by Dr. Dubberke as a follow up to her recent hospitalization for asthma. She was still coughing, wheezing and experienced dyspnea on exertion. She was treating with Chantix to help her stop smoking, but was still smoking one-half pack per day. She reported paranoia as a side effect. She denied being in pain. Dr. Dubberke's objective finding was that her expiratory wheezing was better than when she was in the hospital. (R. 404). His assessment was moderate persistent asthma and paranoia secondary to Chantix. He gave her a shot of Solu-Medrol to treat her asthma and instructed her to continue with her other asthma medication. He instructed her to discontinue the use of Chantix but emphasized the importance of quitting smoking. He offered to refer her back to pulmonary medicine, which she declined. (R. 404-05). At this appointment, Dr. Dubberke listed the following problems: depression, hypertension, tobacco dependence, metabolic syndrome, osteoarthritis, amenorrhea, carpel tunnel syndrome, asthma, COPD, unspecified vitamin D deficiency, Baker's cyst of knee, overweight, acute bronchitis, restless leg syndrome and atypical chest pain. (R. 406).

Dr. Dubberke saw Ms. Pearson again on February 17, 2011. She reported that her asthmatic bronchitis was about eighty percent better, but she was still coughing and wheezing intermittently. She also reported that she was "back to smoking again." She stated that she experienced shortness

of breath after walking approximately 200 feet, but did not have any chest pain. (R. 399). Dr. Dubberke reported a trace expiratory wheeze, but much better air movement. He assessed that her asthmatic bronchitis was improving and instructed her to continue therapy. He prescribed additional treatment and gave her a work excuse for an additional two weeks. His report states that she reported that "there are some issues at work and she may not even be going back." (R. 399). She advised that she was attempting to obtain SSI. (R. 399).

On April 14, 2011, Dr. Dubberke saw Ms. Pearson for treatment of depression. She said she was "still a little blue" but was doing fairly well. (R. 393). She reported sleeping well, no suicidal plan and treatment with Zoloft. She reported a decreased sex drive and expressed her husband's frustration. She was overweight and not exercising much. Dr. Dubberke's report states "she has been back to work and basically is unemployed now with no medical insurance." (R. 393). She had asthma and COPD, but reported breathing fairly well. She could walk 200 feet without getting markedly short of breath. She had hypertension but still used tobacco and was disinclined to quit. She was not taking Prednisone and was doing well with her inhalers. (R. 393). Dr. Dubberke found her lungs were clear. He treated her depression by increasing her dosage of Zoloft. He explained that medication could affect her libido, but that she had some other factors. He recommended she begin walking daily on a regular basis to try to lose some weight. He told her "if she would like to get a job or get back to work, that would be fine with me." (R. 393-94). He reported that her hypertension was controlled and her asthma and COPD were stable and her lungs were actually clear. He strongly recommended she get off of tobacco. He scheduled a three month follow up appointment. (R. 394).

On May 6, 2011, Ms. Pearson was seen by Kristian M. Morrison, M.D. of Shinnston Healthcare, complaining of a headache. She reported that it had ached from on top of her head and

behind her eyes for about a week. She also complained of anxiety and some insomnia. She reported that money was a stressor lately because both she and her husband were unable to work. (R. 389). Upon examination, Dr. Morrison reported that she was negative for shortness of breath and reported her pulmonary function to be of normal effort and breath sounds. She reported her psychiatric state as normal mood, memory, affect and judgment. (R. 389). Her assessment was tension headaches, which she treated with additional medication. (R. 390).

On May 20, 2011, Ms. Pearson saw Dr. Dubberke for a follow up visit. She reported she was sad, she did not have a purpose and felt "dead inside." (R. 383). Although she was not suicidal, she was frustrated as she had not been able to return to work and was looking into disability. She was still smoking one-half to one pack of tobacco per day. She stated her marriage was going okay. She reported that Dr. Morrison had given her medicine to help her sleep, but she was still waking up at night. She was still treating her depression with Zoloft. She did not have chest pains or increased shortness of breath, but she was wheezing and coughing a little bit intermittently. (R. 383). On the day of her visit, she was crying and had a sad affect. Dr. Dubberke heard a trace wheeze in her lungs. Although she was obese, he reported that she was otherwise ambulatory and in no distress. (R. 383). Because she was uninsured, Dr. Dubberke could not prescribe her medication, but instead referred her to the Summit Center for counseling. He instructed her to continue with Zoloft and Elavil, avoid caffeine and to walk daily. He recommended that she find a good church. (R. 383). He assessed that her hypertension was controlled. He emphasized the importance of weight loss. She declined a referral to the hospital for dietary counseling. (R. 384).

On May 27, 2011, Ms. Pearson met with Erika Dawn Rucker, BA/BS, at the Community Mental Health Center of UHC for an initial mental health assessment. Ms. Pearson presented that day with severe depression, anxiety, withdrawal, agitation, mood swings, crying spells, poor

concentration, distractibility, racing thoughts and change in sleep and eating habits. She reported that she had been experiencing these symptoms for a while and that she needed to get help to cope with the problems. She reported having medical problems along with financial problems. She reported that there was stress related to the fact that she could no longer work. She reported her recent hospitalization which she said was her first. (R. 453). Ms. Pearson reported that there were no relationship conflicts at that time, there was no history of depression in her family, she had never been a victim of abuse and she denied suicide and homicide within her family. (R. 454). As for her medical history, Ms. Pearson reported a back problems, COPD and asthma. (Id.). She reported that she had completed high school, worked for several years and was currently unemployed and attempting to get SSDI. (Id.). Ms. Rucker found Ms. Pearson to be oriented to person, place, time and situation. She found her hygiene to be neat and normal and that she dressed appropriate for the weather and for the interview. She observed she made eye contact readily and was cooperative throughout the interview. She detected her mood was sad and depressed and her affect was congruent. She noted that she presented with no bizarre behavior, hallucinations or delusions. (Id.).

Plaintiff's Axis I diagnosis was moderate - major depressive disorder, recurrent. Her GAF score was fifty. (R. 455). She recommended medication management, individual therapy, case management treatment planning to reduce severe symptoms. (R. 455).

Ms. Pearson returned for a follow-up appointment with Dr. Dubberke on June 23, 2011, complaining of anxiety. She reported that her mood was somewhat stable, but that she still got sad. She was going to follow up with Dr. Rush in psychiatry. Despite taking Zoloft, she felt helpless, but not suicidal. She reported poor energy and Dr. Dubberke noted that she was morbidly obese. Her CPAP treats her sleep apnea. She was taking her medications for hypertension and COPD, but

was still smoking a half to a full pack of tobacco per day. (R. 378). On examination, her lungs were clear and her heart was regular. Dr. Dubberke continued her treatment for hypertension. He strongly recommended she quit smoking, but reported that she was really not interested in quitting or trying to quit. For her depression, he continued the current treatment. (Id.).

On June 28, 2011, Sandra Rush, M.D., a psychiatrist, performed a psychiatric evaluation of Ms. Pearson. Ms. Pearson reported that although she had problems with depression most of her life, it had been twenty years since she had any problems. However, over the last several months to a year, she had an increase in her symptoms. She reported that she felt sad, suffered from anxiety, lost interest in going anywhere, slept poorly, was tired during the day and had no energy or motivation. She had problems with her lungs and had quit her job and lost her insurance, which impacted her ability to get the medication needed to treat her conditions. (R. 362). As for her past treatment, Dr. Dubberke had prescribed Zoloft which she had used for several years. However, she did not feel it was helping any longer. She reported that she had never been hospitalized psychiatrically. (Id.). She also reported a history of back problems, COPD, asthma, borderline diabetes, sleep apnea and a hysterectomy for cancer. (Id.). Dr. Rush reported that she appeared older than her stated age. She was alert, oriented, clean and appropriately dressed, but significantly overweight. She had good eye contact and her speech was spontaneous, goal directed and appropriate. Her mood was depressed and her affect was blunted. She reported sleep problems and Dr. Rush assessed her intelligence in the average range with good insight and judgment. (R. 363).

Dr. Rush's Axis I assessment was "Major Depressive Disorder, Recurrent, Severe without Psychotic Features Nicotine Dependence." She found chronic pain, diabetes, asthma, COPD and obesity as Axis III assessments and "Psychosocial Stressors Severe" as her Axis IV assessment. She assessed a GAF of 50. (Id.). Dr. Rush's plan was to have her medicate with Cymbalta and

discontinue Zoloft. She recommended she continue in therapy, discussed exercise with her and planed a follow-up in one month. (Id.).

On July 19, 2011, Dr. Dubberke saw Ms. Pearson for a follow-up examination for her asthma. She reported that she is trying to quit smoking and had reduced to about a quarter of a pack per day. She reported poor energy. She thought the psychiatry and counseling was helping her depression, but she had still been unable to work. (R. 373). Upon exam, her lungs still had some expiratory wheezing, but there was better air movement. Dr. Dubberke prescribed Prednisone for five days and instructed her to continue her nebulizer and to comply with the prescribed medications as she had run out of albuterol. He instructed her to continue to lose weight and applauded her efforts to quit smoking. He asked to go on a thirty gram fiber diet, to exercise daily and follow up with psychiatry for her depression. (Id.).

On October 20, 2011, Ms. Pearson presented to Dr. Dubberke complaining of pain behind her right knee and that numbness and tingling in both hands. Dr. Dubberke's examination reflected a trace of expiratory wheezing. His assessment provided for treatment of paresthesia. He planned to check her B-12, TSH and fasting glucose and put her in wrist splints. He noted that her hypertension was controlled and that he felt she needed to take some type of steroid inhaler for her asthma. (R. 500).

On January 10, 2012, Ms. Pearson was seen by Dr. Morrison for complaints of a cough, cold and sore throat. The diagnosis was acute bronchitis and acute sinusitis. (R. 493). Ms. Pearson reported that she had been coughing for ten days pretty continuously, but was better on the day of her visit. She was congested and could not cough up the lung congestion. She also was experiencing bilateral ear pain. She reported she was continuing to smoke about a pack a day. (R. 494). Dr. Morrison treated her symptoms with medication. (R. 498).

Dr. Dubberke met with Ms. Pearson on January 19, 2012. She presented with complaints of asthma and that she continued to cough and wheeze. She had run out of her QVAR and could not afford it because she did not have insurance. Her coughing was pretty much persistent. She continued to smoke about a half a pack of cigarettes per day. She was morbidly obese and complained that her knees ached quite a bit. She also reported tingling in her hands. Her B-12, thyroid and glucose results were unremarkable. She had no fever, no chest or abdominal pain and her mood had been stable. (R. 487). Dr. Dubberke's assessment was asthma, moderate persistent, carpal tunnel, obesity and tobacco addiction. He put her on QVAR for her asthma, offered to refer her for her carpal tunnel, recommended she go to the gym and exercise on a regular basis to help her knees and to lose some weight. He strongly recommended that she quit smoking. (Id.).

On April 24, 2012, Dr. Dubberke again met with Ms. Pearson. She presented for a follow-up for her asthma and complained that she coughs and gets short of breath easily. She was still smoking and taking the medication QVAR "hit and miss." She had some sadness and crying spells and was seeing Dr. Rush at the Summit Center. She was taking Zoloft but discontinued Cymbalta because she reported it made her agitated. She denies being suicidal. She had lost seven pounds due to metabolic syndrome. Dr. Dubberke found that she was in no distress and was alert and appropriate. He noted she still had a trace of expiratory wheezing. His plan provided for continued treatment of hypertension and a follow-up in six months for the metabolic syndrome. He continued to recommend that she quit tobacco to treat her asthma. He offered to refer her to a dietitian to help her lose weight. He provided her with QVAR samples and increased her dosage to twice a day. He recommended that she stay on the medication and explained that the long term consequences of poorly controlled asthma could lead to remodeling and permanent problems. (R. 480).

On July 18, 2012, Ms. Pearson presented to Dr. Dubberke complaining of back pain which

she had experienced for one week on both lower lumbar areas. She had taken Motrin and Tylenol, but they were not effective. The onset was gradual but became severe the prior week. The pain dissipated the following day, but reoccurred the day prior to the examination. He found that she had neck pain and some leg swelling. (R. 472). His examination revealed normal pulmonary chest sounds, but some wheezes. (Id.). Her mood and effect were normal. He detected pain with movement of her back which was also sore to the light touch on her lower back bilaterally. (R. 473). He prescribed medication for her back pain. He again advised her to decrease her tobacco use and encouraged her to lose weight. He noted lung wheezes and her non-compliance with taking QVAR as directed and asked her to take it twice a day as previously instructed. She was to continue to treat with Zoloft. (Id.).

Ms. Pearson returned for a follow-up with Dr. Dubberke on August 30, 2012. She reported a history of asthma that had been poorly controlled. She coughed and wheezed on a daily basis, but continued to smoke one to two packs per day. She tried various medications to discontinue smoking, all of which had failed. She did not feel she could quit at that point. She also had been treating depression with Dr. Rush at the Summit Center, but had quit going because they changed her medication from Zoloft to Cymbalta, which made her mean. She explained that she cried easily and got sad. She was unemployed, but her husband was employed and she reported her marriage was going well. She was living with her husband, mother and brother. She claimed she did not walk much because she experienced shortness of breath. She denied chest pain but did get epigastric pain on an off on a daily basis. Taking Zantac was not helping. She was coughing and wheezing a little bit on the date of the appointment. (R. 463). Dr. Dubberke found her lungs to have diffuse wheezing. Her respiratory rate was normal, heart regular, abdomen obese and non-tender in the lower quadrants. However, he detected tenderness in the epigastric area. He found

she had diastasis recti. He found that she was otherwise in no distress, but when he talked to her, she began crying. (Id.). To treat her epigastric abdominal pain, his plan was to keep her on Tramadol and see her in one month. To treat her asthma, he put her on Prednisone and Advair and gave her some samples. He again requested to see her in a month. For her depression, he increased her Zoloft and scheduled to reevaluate her condition in three to four weeks. (Id.).

On November 1, 2012, Plaintiff underwent a Review Assessment by Sarah Howes, a non-physician, with the United Summit Center. (R. 508); see infra p. 27, Part 4(f). Ms. Howes diagnosed Plaintiff with major depressive disorder, recurrent – moderate. The recommended treatment included high end services such as care coordination, pharmacological management and individual therapy. (R. 510).

Ms. Pearson was treated by Dr. Rajjoub on November 12, 2012, on a referral from Dr. Dubberke. She reported a dry cough and wheezing. She reported tightness in her chest, ankle/leg edema, acid reflux and reported that she continued to smoke one-half pack per day. (R. 513). Dr. Rajjoub's examination revealed Ms. Pearson's obesity and wheezing. His diagnosis included COPD, shortness of breath, coughing, chest pain and toxic tobacco. He advised her on the use of an inhaler, on the effects of steroids and to quit smoking. (Id.)

3. **Medical Reports/Opinion Evidence**

a. **Physical Residual Functional Capacity Assessment by Fulvio Franyutti, MD**

On June 24, 2011, Fulvio Franyutti, MD, completed a Physical Residual Function Capacity Assessment of Ms. Pearson. (R. 353-60). For exertional limitations, Plaintiff was limited to occasionally lifting/carrying twenty pounds; frequently lifting/carrying ten pounds; standing/walking for about six hours in an eight hour day; sitting for about six hours in an eight hour day; and unlimited pushing and/or pulling. (R. 354). For postural limitations, Plaintiff was

found to be able to occasionally climb ramps/stairs, balance, stoop, kneel, crouch and craw, but never climb ladders, ropes and scaffolds. (R. 355). Dr. Franyutti found no manipulative, visual or communicative limitations. (R. 356-57). As for environmental limitations, Ms. Pearson could have unlimited exposure to wetness, humidity and noise, but should avoid concentrated exposure to extreme heat, cold, vibration, fumes, odors, dusts, gases and poor ventilation, and hazards such as machinery and heights. (R. 357). As for the severity of Plaintiff's symptoms, Dr. Franyutti found her to be partially credible. (R. 360).

Dr. Franyutti noted that there were no medical source statements regarding Plaintiff's capacities in the file when the evaluation was conducted. (R. 359). Dr. Franyutti referenced medical records indicating Plaintiff had a normal chest x-ray on October 26, 2009; an unremarkable right knee x-ray on February 5, 2010; a Duplex scan on February 5, 2010 of her left knee which showed no evidence of deep venous thrombosis; x-rays on February 18, 2010, for right knee pain which appeared to be a slight narrowing only of the medial compartment with no osteophytes and commented that "the notch looks good" and "the lateral compartment looks good," a report of right knee pain on February 24, 2010, with some mild osteoarthritis of the right knee and a Baker's cyst posteromedial; a report of a normal gait and range of motion of April 6, 2010; a report of left knee pain on April 22, 2010, with the note that the records only talk about her right knee; a normal PA and lateral chest x-ray on September 7, 2010, following complaints of asthma pain with coughing and wheezing; an examination on October 27, 2010, reflecting Plaintiff's weight at 289; a normal chest x-ray on November 22, 2010; a discharge summary with reported symptoms. Acute asthmatic bronchitis, hypertension, osteoarthritis, carpal tunnel, low vitamin D, metabolic syndrome, restless leg syndrome, Baker's cyst on right, atypical chest pain with a chest x-ray which reflected no acute cardiopulmonary process; and a report dated April 19,

2011 reporting low theophylline. (R. 360).

On June 28, 2011, Dr. Franyutti reported a new medical evidence of record was received but that no change of RFC was needed. (R. 361).

### b. Disability Determination Examination by Bennett Orvik

On September 27, 2011, Dr. Orvik performed a disability determination examination. Ms. Pearson presented as alert, oriented and generally appropriate. She was not working on the date of the appointment and reported that she last worked in January 2010. Her previous employment was as a certified nursing assistant in a nursing home which she had done for somewhat less than twenty years. She reported that she quit because she was having several medical problems and missing regular work. (R. 432).

She reported a history of asthma and treatment with medication. She reported that she had several lung infections which were becoming recurrent and that she could not continue to work. She complained of a fairly constant problem with shortness of breath and wheezing. She also reported a history of diabetes which she was treating with oral medications and her diabetic control was usually fairly good. (R. 432-33). She also stated that she was being treated for hypertension and that her blood pressure control was fairly good. In addition, she reported that she had a history of sleep apnea and had been using a CPAP machine, but due to the loss of her job and her medical insurance, the CPAP machine had been taken away. She also was not using supplemental oxygen at night. She claimed she was very nervous at times and had significant arthritic pain at times. She reported trouble with anxiety and that she did not like to be around people very much. She stated she had a hard time standing and walking very far because of arthritis in her knees. (R. 433). She claimed her shortness of breath was exacerbated with minimal exertion and exposure to extreme heat or cold. She reported that her asthmatic condition had been present for years and that she was

unable to work due to her shortness of breath which she contended was getting worse. She disclosed pain, mostly aching, in her knees mostly on the right. Although the pain was constant, the intensity the pain was a three to four out of ten, but sometimes got as high as ten out of ten. Her pain was aggravated by standing and walking. She treated the pain with ibuprofen or Tylenol, two to three at a time, which helped somewhat. (Id.). She reported she had treated for diabetes for three to four years, hypertension for eight years and asthma for several years. (Id.). She had been hospitalized for COPD on two to three occasions and hospitalized for child birth. (Id.). Her reported symptoms included some difficulty with sinus, significant asthma and COPD, history of hypertension and diabetes, some difficulty with diarrhea and occasional headaches. (R. 434). At the time of the examination, she reported she was smoking a quarter of a pack of cigarettes per day, but previously smoked more. She denied the use of alcohol or drugs. (Id.).

Upon examination, Dr. Orvik noted a reasonably normal general appearance, but noted she appeared somewhat out of breath at rest and noted audible inspiratory and expiratory wheezing. He noted that auscultation revealed fairly prominent inspiratory and expiratory wheezing throughout all lung fields. Her body habitus and nutritional status reflected rather extreme obesity. She measured sixty-one inches tall and weighed 277 pounds (R. 434-35). Dr. Orvik noted a decrease in abduction in both shoulders, normal elbow and wrist motions, knee flexion and extension to ninety degrees on the right and normal on the left, hip flexion limited to eighty degrees on the right and normal on the left with other hip motions normal, ankle and cervical spine motions normal and her lumbar spine range of motion to be normal. He did not detect any area of joint inflammation, swelling or deformity. He noted some tenderness of her right knee. Although her stance was normal, her gait showed a mild right sided limp. She could not walk well on her heels or toes, but was able to tandem walk fairly well. She could bend to ninety, could squat minimally

and could arise from a minimal squat without too much trouble. She experienced trouble getting in and out of the chair and had difficulty getting on and off of the examination table. She reported having difficulty with dressing and undressing with regard to her shoes and socks. (R. 435). She was able to write well and was able to pick up small objects well. (R. 436).

A pulmonary function test showed forced vital capacity of sixty-seven percent of predicted and forced expiratory volume in one second of sixty-eight percent of predicted. Following aerosol treatment, her vital capacity improved to seventy-five percent of predicted and forced expiratory volume at one second improved to seventy-three percent of predicted. This resulted in a finding of mild restrictive lung disease with no significant improvement with the aerosol treatment. (R.436).

Dr. Orvik provided the following conclusions, opinions, diagnosis and impressions: asthma, morbid obesity, mild restrictive lung disease, non-insulin-dependent diabetes mellitus, hypertension, sleep apnea and possible panic disorder. (Id.). Although he believed that the medications she was currently using were generally appropriate, he believed that her prognosis for significant improvement in her various problems would not probably be very good unless she was able to lose a great amount of weight. (Id.).

Dr. Orvik summarized that her most obvious physical finding was her extreme obesity, but noted she had significant inspiratory and expiratory wheezing at rest. (Id.). As for her limitations, she reported she had no problem sitting in that she could stand for maybe one half hour to an hour and then had to sit down because she experienced a shortness of breath. She reported to getting short of breath in less than one hundred yards. She reported she could do some lifting but not much carrying. She stated she could handle objects with her hands and that traveling in a vehicle was not a problem and that she drove. She did not have any hearing or speaking issues to report. (Id.).

### c. Physical Residual Function Capacity Assessment, Porfirio Pascasio, MD

On October 4, 2011, Porfirio Pascasio, MD, a medical consultant, completed Plaintiff's Physical Residual Functional Capacity. (R. 445-52). Dr. Pascasio found that Ms. Pearson could occasionally lift and/or carry twenty pounds; she could frequently lift and/or carry ten pounds; she could stand and/or walk about six hours in an eight hour day; she could sit about six hours in an eight hour day; and she had no limitations of her ability to push or pull except for the weight limitations noted. (R. 446). As for her postural limitations, Dr. Pascasio found that Ms. Pearson could occasionally climb ramps/stairs, balance, kneel, crouch and crawl. However, she should never climb ladders, ropes and scaffolds. (R. 447). Ms. Pearson was not found to have any limitations as to her manipulative, visual or communicative functions. (R. 448-49). Dr. Pascasio found she should avoid concentrated exposure to extreme cold or heat, vibration, fumes, odors, dusts, gasses and poor ventilation and hazards such as machinery and heights. No limitation was found as to exposure to wetness, humidity or noise. (R. 449). Dr. Pascasio concurred with the prior RFC evaluation that Plaintiff is partially credible and that her RFC remains light. (R. 450). Dr. Pascasio noted that there was a medical source statement regarding the claimant's physical capacity in the file and that he agreed with the Opinion of Limitations stated by Bennett Orvik, MD in his September 27, 2011, report. (R. 451). Dr. Pascasio also referenced that Ms. Pearson had stated that she had no worsening of conditions on a recent appeal form. He also noted the sleep study performed on October 11, 2011, which noted obstructive sleep apnea syndrome, nocturnal hypoxia and a January 18, 2011 chest x-ray that found no acute cardiopulmonary process. He also noted the medical records of Lance Dubberke for appointments on February 23, 2011, February 17, 2011, June 23, 2011 and July 19, 2011. Finally, he reported the findings of Dr. Orvicks September 27, 2011, examination and of Dr. Franyutti's physical residual functional capacity assessment dated June 24, 2011. (R. 452).

### d. Psychiatric Review Technique by Frank Roman, Ed.D.

On August 25, 2011, Frank Roman performed a consultative psychiatric evaluation of Ms. Pearson. Specifically, he reviewed medical records to address her disorders. He determined that Ms. Pearson suffered from an affective disorder affecting her mood and accompanied by depressive syndrome resulting in decreased energy and feelings of guilt or worthlessness. (R. 417). He addressed her functional limitations under the "B" criteria of the listings and determined that Ms. Pearson had a mild impairment of her activities of daily living, a moderate impairment in maintaining social functioning, a mild impairment of maintaining concentration, persistence or pace and no impairment relating to episodes of decompensation, each of extended duration. (R. 424). He further concluded that the evidence did not establish the presence of the paragraph "C" criteria. (R. 425).

### e. Mental Residual Functional Capacity Assessment by Frank Roman, Ed.D.

On August 25, 2011, Dr. Roman considered a category 12.04 Listing for Plaintiff's Mental Residual Functioning Capacity Assessment. Dr. Roman found that Plaintiff was not significantly limited in her understanding and memory. As for her sustained concentration and persistence, he found that she was moderately limited in her ability to carry out detailed instructions, her ability to maintain attention and concentration for extended periods and her ability to work in coordination with or proximately to others without being distracted by them. However, she was not significantly limited in the remaining five areas. (R. 428-29). As for her social interaction, Dr. Roman found that she was not significantly limited in four of the five areas, but had a moderate limitation in her ability to accept instruction and respond appropriately to criticism from supervisors. (R. 429). She was not found to have any significant limitation in the four areas dealing with adaptation. (Id.).

With regard to her functional capacity assessment, Dr. Roman notes Plaintiff's moderate

deficit in the social domain, but provides that these deficits do not meet or equal a listing. (R. 430). He noted she was forty-three years of age and had worked as a CNA until she quit in November, 2011. She claims she quit due to COPD, HTN, arthritis and sleep apnea. Her hospital reports reflect a long history of depression with significant weight gain and a GAF of 50, reflecting moderate deficits in overall functioning. He noted that her medication had been adjusted and exercise was highly recommended. Dr. Roman reports that she is independent in her activities of daily living and that she retains the capacity to follow routine work duties with minimal change in routine and low production standards. He states that she can interact in a casual manner with peers and the public and can respond to supervision. Finally, her employment would have to take into account her COPD. (R. 430).

**f.  United Summit Center Evaluation by Sara Howells, November 1, 2012**

On November 1, 2012, Ms. Pearson was evaluated by Sara Howells, BS/PD/CC for a review assessment. This was listed as a mental health assessment by a non-physician. Ms. Pearson presented as seeking treatment for depression, anxiety, panic attacks and poor concentration. She reported experiencing depression every day, by crying over everything, not wanting to be around other people and wanting to be left alone. She reported "the depression is always there and never goes away." She reported that she experienced panic attacks several times a week, hot flashes, shaking and crying. She stated that she was unable to think or concentrate and had a difficult time comprehending information. She stated that when she got nervous, her teeth began to chatter and it was difficult to control. She reported that she got agitated easily over different situations. She stated that she only got a couple of hours sleep and got up throughout the night and that her mind raced all the time about dumb stuff. She stated that when she looks in a mirror at herself, "I talk back to me" and that she is unable to look in the mirror. She claimed that she got very paranoid

about sitting around other people because she thought they were talking about her. (R. 508). She stated that is why she secluded herself from other people but also stated that she would like to be remembered when she died. She mentioned "that she feels like she does nothing right at home or at work." (R. 509). She did not recall when the symptoms began and she denied any past hospitalization or treatment for her mental health distress. (Id.). She reported that no one talked in her family, that she barely spoke to her husband and had no contact with other family members. She denied any physical or sexual abuse but reported that her family had a history of mental illness, but was unable to remember the direct mental health distress. She reported that her brother was going to commit suicide but was unable to follow through with his plan. She denied any family history of homicide or violence. (Id.). Ms. Pearson reported that she had suicidal thoughts when she was depressed but stated that she would never attempt suicide because she would "mess it up." (Id.). She denied suicidal or homicidal ideations. She reported taking Zoloft, blood pressure medication, Albuterol for breathing, Advair, Zantac and Mirapex. She denied hospitalization for physical reasons. (Id.).

The evaluator found Ms. Pearson to be oriented to person, place, time and situation. She presented with a labile affect and cried throughout the assessment. She expressed concern about not getting committed to a hospital and did not display any suicidal or homicidal ideations at the time of the assessment. (R. 510). She was administered an adult functional assessment that rated her a moderate dysfunction. She was also administered a Suicidal and Violence Risk Assessment which rated her a mild risk. (Id.). Her primary Axis I diagnosis from the DSM-IV was moderate – major depressive order, recurrent. Her Axis V was a GAF score of 50. The evaluator recommended that she receive high end services including care coordination, pharmacological management, individual therapy and review assessments every ninety days. (Id.).

**4.      New Evidence Submitted to the Appeals Council**

**a.   United Summit Center, Psychological Evaluation, November 20, 2012**

On November 20, 2012, Ms. Pearson was evaluated by psychologist Dennis J. Kojsza, Ph.D., by referral from her therapist, Cheryl Cornwell. Ms. Pearson had seen Ms. Cornwell for the first time two weeks prior to the evaluation. Ms. Pearson was seeking treatment as a result of depression and anxiety attacks. She stated that if she went out of the house she experienced panic attacks. She stated that this occurred when she was in a room with a lot of people. She reported that she experienced anxiety attacks when she drives and therefore, does not drive much anymore. She estimated that she experienced an anxiety attack at least a couple of times a week. As for her depression, she claimed that she did not enjoy anything and had no particular interests. She also identified a sleep disturbance where she slept for very short periods of time and did not like to sleep at all during the night. (R. 517). She had not worked since she quit her job at Continuous Care Clarksburg in 2011 and stated that she was not physically able to do her job. She reported that she did very little at home except to clean her house. She reported a somewhat strained relationship with her husband. (Id.). She reported suffering from COPD, arthritis, hypertension and obesity. She denied experiencing delusions or any auditory or visual hallucinations but stated that voices in her head "do talk to her." She was prescribed Zoloft and Wellbutrin. (R. 518).

Ms. Pearson was dressed and groomed appropriately, her mood was depressed and her affect mood, congruent, she showed no structural abnormality of thought or speech and there was no evidence for delusions. She was confused about whether she heard voices in her head, she was oriented in all spheres and showed fair immediate, recent, and remote recall. She had never been self or other-injurious although she had suicidal ideation. She recognized she had emotional problems. (R. 519). Ms. Pearson had an Estimated Full – Scale Wechler IQ of 101, which was well

within the average range of intellectual functioning. The MMPI-2 was of questionable validity. Dr. Kojsza identified various reasons as to why the results may be invalid, but stated that he believed that one of the following could be accepted as an explanation: 1) Distortion or exaggeration of the severity of psychopathology, in an attempt to derive secondary gain; or 2) a plea for help by an extremely anxious individual. (R. 520). Dr. Kojsza reported that the clinical scales show that Ms. Pearson was experiencing moderate to severe emotional distress. He stated that overall her prognosis was poor and her problems were chronic. (Id.). He recommended that she continue to receive psychopharmacological intervention to address her major symptoms of depression and anxiety attacks. Further, he recommended intensive individual psychotherapy to address her feelings of hopelessness and to help gain incentive to address her problems. (R. 521).

His diagnosis for Axis I: Major Depressive Disorder, Recurrent, Moderate, and Anxiety Disorder; Axis II: Avoidant Personality Disorder; Axis III: Arthritis, COPD, hypertension, obesity; Axis IV: Primary support, social and environmental, and occupational problems; Axis V: GAF=50. (R. 522).

### b. Additional Medical Evidence from Dr. Salam Rajjoub, April 20, 2010 through February 11, 2013

The new medical evidence submitted included appointments with Dr. Rajjoub on April 20, 2010 (R. 537), May 3, 2010 (R. 530), September 22, 2010 (R. 529), November 9, 2010 (R. 528), November 30, 2010 (R. 526), November 12, 2012 (R. 525), February 11, 2013 (R. 524). Plaintiff presented the appointments with Dr. Rajjoub with shortness of breath and wheezing. Her history of present illness included dry cough, wheezing, dyspnea with rest and activity, chest pain, ankle and leg edema, snoring/apnea, daytime sleepiness and heartburn/acid reflux. Her physical examinations noted Plaintiff to be obese and were largely normal with the exception of wheezing.

Her diagnoses included COPD, fatigue, obesity, EDS, shortness of breath, wheezing, cough, toxic tobacco use and OSAS. Dr. Rajjoub advised Ms. Pearson on the use of an inhaler, the side effects of steroids, and advised her to quit smoking.

Plaintiff also underwent spirometry tests with Dr. Rajjoub on April 20, 2010 (R. 533), September 22, 2010 (R. 532), November 12, 2012 (R. 531). The tests noted moderate, mixed and restrictive defect, respectively.

A pulmonary function report from May 3, 2010, noted mild airway obstruction, low normal lung volumes, in combination with significant obstruction suggest a probable concurrent restrictive process. (R. 536). Diagnoses were mild obstructive airway disease and restriction – probable. (Id.).

## C.    Testimonial Evidence

At the administrative hearing on November 15, 2012, Plaintiff testified that she was born on July 7, 1968 and was forty-four years of age at the time of the hearing. She stands a 5'1" tall and weighs approximately 275 pounds. (R. 48). She testified that she is married and lives with her husband and her mother. She has one child who is twenty-three years of age. (R. 49).

Ms. Pearson graduated from high school and obtained post-high school training as a nursing assistant. She was a certified nursing assistant until her certification expired. (R. 50). Ms. Pearson worked at Clarksburg Nursing and Rehabilitation for many years. She was employed as a CNA and did not have any supervisory duties. She provided medication to patients, took vital signs and recorded this information in the patients' charts. (R. 52, 53).

Ms. Pearson testified that her sole source of income was her husband's employment. Further, she testified that she had worked in January 2011, but had to stop because "I wasn't able to do it." She claimed she could not work because she could not breathe or walk. She stated that she tried to work two days and when she did her legs "swelled up a real big, and they got red and

hot from my knees down." (R. 51, 52).

Ms. Pearson testified that her family doctor is Dr. Dubberke. She would also see specialists on occasion, but would sometimes not go to the specialist "because I don't have the money to pay for it." (R. 54). She testified that she did not want to spend any money on her because she did not make any money. Further, she claimed to have trouble breathing. She stated that she wheezes, coughs a lot and has a very low energy level. She takes multiple medications to treat her breathing condition. (R. 55). She is required to utilize a disc inhaler four times a day. Each treatment last for fifteen minutes, exclusive of the time it takes to prepare the inhaler apparatus. (R. 55, 56). Ms. Pearson stated that her chest gets tight and it is difficult to get air into her lungs. As a result, she gets panicked and nervous. She has seen lung specialist, Dr. Rajjoub, occasionally for treatment. She has only seen him two or three times and claims she does not have the money for further treatment. (R. 56, 57).

She testified that she also suffers from edema or swelling from her knees to her ankles. She claims that when she is on her feet for very long time "they swell up real big and red and get a rash all over them. And then I have to take an antibiotic to get rid of it." (R. 56, 57). Further, Ms. Pearson testified that if she is seated for a long time, her legs would fall asleep and swell and she was instructed by Dr. Dubberke to elevate her legs to avoid swelling. (R. 57). She also testified she had a cyst behind her right knee and was seeing Dr. Waxman for treatment. She claims the cyst prevents her from bending, squatting, crouching or walking stairs. (R. 58).

Ms. Pearson smokes cigarettes and has tried to stop. She claims she gets headaches if she doesn't have a cigarette once in a while. She also stated she gets tension headaches every day that sometimes last all day. She treats her headaches by lying down and she testified that she lays down most of the day. (R. 62). In addition, Ms. Pearson claims she limps because her right leg won't

bend. She stated that she has difficulty breathing every day. Certain scents or odors cause her to wheeze more than others, such as perfumes, pollen and mildew. (R. 63).

Ms. Pearson lives with her husband and mother but does not provide care to her mother. She states that she does not cook very often because "I just don't feel like it." (R. 59). She does laundry but only her clothing. She goes to the grocery store for about an hour, but only when her husband will go with her. (R. 59, 60). Ms. Pearson stated that she drove a couple times a week, but did not drive in traffic because she got nervous. She did not drive to the hearing that day. (R. 49, 50). She claims that she can stand for ten to fifteen minutes, remain seated for an hour at a time, and walk one hundred feet. (R. 60). She stated that if she walks more than one hundred feet, she has trouble breathing.

As for mental health treatment, Dr. Dubberke referred her to the Summit Center, a mental health facility in Clarksburg to talk to someone about her crying and panic attacks. She stated that she had been to the Summit Center in the summer of 2011 and had seen Sandra Rush. She testified that she feels depressed during the day because "I'm no good for anything. I can't do anything." (R. 61). Ms. Pearson testified that when she first sought services, she received services for free. She stated that she stopped going because "I didn't feel like it was helping me any. I went for a long time, and…I didn't like talking about all that stuff." (R. 66). In response to a question concerning her recent visit to the Summit Center, Ms. Pearson denied that she was working despite the notation in the records that states "it says that you feel like you don't do anything right at home or at work." (R. 66, 67).

Ms. Pearson testified that she had seen Dr. Rajjoub the week prior to the hearing. He administered a test that required her to blow into a tube. She initially took the test without medication. He then administered medication and had her repeat the test. After the medication, the

test made her start to cough and she could not catch her breath for a little while. (R. 64).

Ms. Pearson testified that she did not think she could do a job that required her to sit down most of the day because she could not sit that long and that there are "days I can't even get out of bed." (R. 65). She testified that it was mostly her mental condition that prevented her from getting out of bed on certain days. However, she also suffers from asthma attacks and when she sits for long periods of time, her legs go to sleep. (Id.).

**D.    Vocational Evidence**

Also testifying at the hearing was Timothy Mahler, a vocational expert. Mr. Mahler characterized Plaintiff's past work as a certified nursing assistant as medium, semi-skilled. (R. 69). With regard to the Plaintiff's ability to return to her prior work, Mr. Mahler gave the following responses the ALJ's hypothetical:

Q:    Assuming an individual of the same age, education, and work background as the claimant who is capable of performing sedentary work as defined in the regulations but with the following limitations:

Should be a sit – stand option, which would allow the person to change positions briefly for 1 to 2 minutes every 30 minutes. The person could walk no more than 10 minutes at a time and for no more – – I'm sorry – – could stand or walk no more than 10 minutes at a time for no more than a total of two hours out of the day. There should be no crouching, crawling, climbing of ladders, ropes, or scaffolds and more than occasional balancing, stooping, or climbing upstairs or ramps; should be no concentrated exposure to extreme heat and cold, wetness and humid, vibration, or hazards, such as dangerous moving machinery or unprotected heights. There should be little, if any, exposure to respiratory irritants, such as dust, fumes, odors, and gases. The work should be limited to simple, routine and repetitive instructions and tasks; performed in a  low – stress setting, which I'll define as requiring no assembly line and no fast – paced production. There should be no contact with the public and no more than occasional interaction with coworkers and supervisors.

Would such a person be able to perform any of the claimant's past work?

A:    No, Your Honor.

(R. 69-70).

Incorporating the above hypothetical, the ALJ then questioned Mr. Mahler regarding Plaintiff's ability to perform other work. Mr. Mahler testified that there were jobs at the sedentary, unskilled level that would comply with the ALJ's hypothetical. Such jobs included document preparer, sedentary addressers, surveillance system monitors and table workers (inspectors and sorters). (R. 70-71). Mr. Mahler testified that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"), with the exception of the sit-stand option. (R. 71). Plaintiff's attorney chose not to question Mr. Mahler when provided the chance. (R. 72).

### E.    Lifestyle Evidence

On June 12, 2011, Plaintiff completed an adult function report. (R. 173). In the report she complained of pain in her legs which hurt more when she was "up for long periods," shortness of breath upon exertion, frequent headaches, concentration issues, and anxiety attacks when around other people. She described her day as starting at 3:00 AM when she would get up to have coffee with her husband. She then stated that she went back to sleep when he went to work and woke up at 7:00 AM. She then walked her dog, showered and did dishes, some laundry and watched television. At around 2:00 PM, she took a nap until approximately 4:00 PM. Thereafter, she would start dinner and then watch TV until she went to bed at 11:00 PM. (R. 174). Her apnea wakes her every two hours with bad headaches. As a result, she gets sleepy during the day.

Plaintiff stated she did her husband's laundry once a week and sometimes made his lunch. She fed her dog and would take it for short walks, but received assistance from her husband. When asked what she was able to do before the onset of her disability that she could not do now, she responded "I can't walk very far before becoming short of breath."

As for her personal care, Plaintiff stated that she cannot lift her right leg high enough to

put her socks and pants on. She must sit and put her leg on a bed. She also stated it was hard for her to step into a bathtub. Otherwise she had no personal care issues. If she falls asleep watching TV, her husband will wake her up and remind her to take her medication. Otherwise, she did not require help or reminders to take her medication. (R. 174-75).

She was able to prepare her own meals, which were comprised mainly of soup, sandwiches, cold cereal and frozen foods. She made easily prepared foods daily and complete meals on a weekly basis. She estimated that it took her two hours to prepare a meal. She stated that her disability has changed her cooking habits because she just doesn't have the energy to cook and that she is always too tired in the evening and has no desire to cook. (R. 175).

Plaintiff is able to do laundry, light cleaning and load the dishwasher. She performs these functions a couple times a week, but it takes her several hours as she has to stop every little bit. She stated that she receives assistance from her husband who carries the laundry to the laundry room because there are too many steps for her to walk up.

Plaintiff claimed that she could walk, drive a car, ride in a car and that she went outside daily. She shopped for groceries and picked-up her medication two times per week for about two hours. She does her stopping in stores and on her computer. (R. 176). She was able to pay bills, count change and use a checkbook. However, she claimed her disability has changed her ability to handle money and sometimes her husband has to help her because she forgets to pay the bills on time. (R. 176-77).

Her interests included watching TV and playing on the computer. She testified she watched TV daily and used the computer approximately two times per week. She indicated that she watched TV more than she used to. (R. 177). Plaintiff reported that she talked to her daughter daily on the

phone, but did not identify other social activities. She claimed she keeps her doctor appointments in writing so that she does not forget. Finally, she gets short tempered easily and she does not visit with any neighbors and she does not have many friends. She disclosed that she used to go out more, but she does not really want to be around people. (R. 178).

She claimed that her disability affects her ability to lift, squat, bend, stand, walk, kneel, talk and climb stairs. Further, her disability affects her memory, her ability to complete tasks, her concentration, her ability to follow instructions and her ability to get along with others. She stated that she can only walk a very short distance and that her right leg prevented her from doing things because it does not bend. She claimed that she does not want to talk to people because she gets nervous and anxious and she has a hard time maintaining her focus.

Plaintiff testified she was able to walk 100 feet and then had to rest two or three minutes before she could resume walking. She was able to pay attention for thirty minutes but was unable to finish what she started. Following written instructions was difficult because she had to read them several times. However, she was able to follow verbal instructions and stated that she does "okay just forget things sometimes."

Although she had never been fired or laid off from her job because of problems getting along with other people, she stated that authority figures make her very nervous and that she does not handle stress well. Further, she claimed that she does not handle changes in routine well. Finally, she provided that she gets paranoid and does not want to be around a lot of people nor does she want to go anywhere by herself. (R. 179). When identifying her medications, Plaintiff listed Albuterol treatments and Mobic. She stated that the Albuterol causes her to shake and the Mobic upsets her stomach. (R. 180).

# IV.  THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work…'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A) (2006). The Social Security Administration uses the following five-step

sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . ." 20 C.F.R. §§ 404.1520; 416.920 (2011).]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520; 416.920 (2011). If the claimant is determined to be disabled or not disabled at one of the five steps, the process does not proceed to the next step. Id.

## V.  ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

1.  **The claimant has not engaged in substantial gainful activity since November 15, 2010, the alleged onset date (20 CFR 404.1571 et seq., 20 CFR 416.920(b)).**

2.  **The claimant has the following severe impairments: morbid obesity; chronic obstructive pulmonary disease/restrictive lung disease; sleep apnea; mild degenerative joint disease in the right knee with a bakers cyst, status post aspiration; hypertension; metabolic syndrome; restless leg syndrome; and major depressive disorder (20 CFR 404.1520 (c), 20 CFR 416.920(c)).**

3.  **The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 20 CFR 416.920(d), 416.925 and 416.926).**

4.  **After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except with the following limitations: sit/stand option allowing a person to change position for 1-2 minutes every 30 minutes; can stand/walk no more than 10 minutes at a time and for no more than a total of 2 hours per day; no crouching, crawling, or climbing ladders, ropes or scaffolds and no more than occasional balancing, stooping or climbing upstairs or ramps; no concentrated exposure to extreme heat and cold, wetness and humidity, vibration, or hazards such as dangerous moving machinery or unprotected heights; little, if any, exposure to respiratory irritants, such as dust, fumes, odors and gases; limited to simple, routine and repetitive instructions and tasks; performed in a low stress setting, defined as requiring no assembly line or no fast paced production requirements; and no contact with the public and no more than occasional interaction with co-workers and supervisors.**

5.  **The claimant is unable to perform any past relevant work (20 CFR 404.1565, 20 CFR 416.965).**

6.  **The claimant was born on July 7, 1968 and was 42 years old, which is defined**

as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563, 20 CFR 416.963).

7.    The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564, 20 CFR 416.964).

8.    Transferability of job skills is not material to the determination of disability because it using the Medical – Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a).

10.   The claimant has not been under a disability, as defined in the Social Security Act, from November 15, 2010, through the date of this decision (20 CFR 404.1520(g), 20 CFR 416.920(g)).

(R. 27-34).

## VI.    DISCUSSION

### A.    Standard of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th

Cir. 1984) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1968)). However, "it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment…if the decision is supported by substantial evidence." <u>Hays</u>, 907 F.2d at 1456 (citing <u>Laws</u>, 368 F.2d at 642; <u>Snyder v. Ribicoff</u>, 307 F.2d 518, 529 (4th Cir. 1962)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).

**B.     Contention of the Parties**

Plaintiff, in her Motion for Summary Judgment, asserts that the Commissioner's decision "denying Plaintiff's claim is not supported by substantial evidence." (Pl.'s Mot. at 1). Plaintiff raises three issues:

- The ALJ failed to follow HALLEX, which requires remand as the ALJ failed to comply with its own promulgated rules and regulations. Specifically:
  - The ALJ deprived Plaintiff of due process by refusing to hold open the record in direct violation of HALLEX I-2-6-78.
  - The ALJ deprived her of due process by failing to provide an "Exhibit List" in violation of HALLEX I-2-1-20.

- The ALJ misapplied SSR 96-7p by comparing Plaintiff's credibility to the RFC instead of the entire case record and erred by using boilerplate language. Moreover, the ALJ did not articulate a rational analysis for discounting her credibility.

- The Appeals Council erred by finding that the new evidence submitted by Plaintiff relates to a time after the ALJ's decision.

(Pl.'s Br. in Supp. of Mot. for Summ. J. ("Pl.'s Br.") at 5, ECF No. 11). Plaintiff asks the Court to remand the case for the sole purpose of calculation of benefits. (<u>Id.</u> at 15).

Defendant, in her Motion for Summary Judgment, asserts that the decision is "supported

by substantial evidence and should be affirmed as a matter of law." (Def.'s Mot. at 1). Specifically,

Defendant argues that:

- Plaintiff received a full and fair administrative process because Plaintiff was on notice about which exhibits the ALJ took into consideration in reaching her decision and HALLEX does not impose judicially enforceable duties on the ALJ or the courts.

- Substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints.

- The evidence submitted to the Appeals Council after the ALJ's decision does not require remand.

(Def.'s Br. in Supp. of Mot. for Summ. J. ("Def.'s Br.") at 11-18, ECF No. 15).

**C.    Analysis of the Administrative Law Judge's Decision**

**1.   Whether the ALJ failed to Comply with HALLEX**

Plaintiff argues that the ALJ failed to follow HALLEX and deprived her of due process in

two ways. (Pl.'s Br. at 5-7). First, the ALJ violated HALLEX I-2-6-78 by refusing to hold open

the record to allow evidence from United Summit Center to be submitted. (Id. at 5). This failure

deprived Plaintiff of her right to have all evidence heard. (Id. at 5-6). Second, the ALJ deprived

Plaintiff of due process by failing to provide an "Exhibit List" in violation of HALLEX I-2-1-20.

(Id. at 6-7). Without an Exhibit List, Plaintiff questions what evidence was relied on to deny her

application and whether ALJ's decision accounts for new records submitted. (Id.).

Defendant argues that Plaintiff received a full and fair administrative proceeding. (Def.'s

Br. at 11). Defendant alleges that Plaintiff was on notice about which exhibits the ALJ took into

consideration in reaching her decision. (Id.). The ALJ identified the exhibits at the beginning of

the hearing, confirmed that the Plaintiff's counsel had an opportunity to review them and

confirmed that Plaintiff's counsel did not have an objection. (Id.). As for outstanding evidence, the

ALJ advised Plaintiff's counsel that she was disinclined to hold the record open for what appeared

to be evidence similar to was already in the record and advised Plaintiff's counsel that he could submit additional evidence if he received it. (Id.). She argues that Plaintiff has failed to demonstrate a colorable constitutional claim that would trigger a due process violation as HALLEX does not create constitutional rights and HALLEX does not impose judicially enforceable duties on an ALJ or the courts. (Id. at 12).

The Hearings, Appeals, and Litigation Law Manual ("HALLEX") is a "manual in which the Associate Commissioner of Hearings and Appeals conveys guiding principles, procedural guidance and information to the office of Hearings and Appeals (OHA) staff." Melvin v. Astrue, 602 F. Supp. 2d 694, 699 (E.D.N.C. 2009). HALLEX I-2-1-20 states that "if the ALJ issues a partially favorable or unfavorable decision, the exhibit list must be prepared in final form and placed in the claim file." The rule further explains in a note:

> The Chief Administrative Law Judge (CALJ) in a Reminder dated October 25, 1999, stated that based on the constitutional due process requirement that a claimant has the right to know upon what basis the ALJ is making the decision in his/her case, the preparation of exhibit lists in partially favorable and unfavorable cases is not a discretionary practice. Exhibit lists must be prepared.

HALLEX I-2-1-20. HALLEX I-2-6-78 states, in pertinent part:

> If the claimant or representative have additional evidence to submit, or the ALJ determines that additional evidence is needed (e.g., a consultative examination or an updated medical report), the ALJ will inform the claimant and representative (if any) that the record will remain open after the hearing to allow time to submit or obtain the additional evidence. If the claimant and representative intend to submit additional evidence, the ALJ will decide how long to leave the record open.

The Fourth Circuit has not addressed whether a violation of HALLEX rules constitutes reversible error. However, the Fifth and Ninth Circuits have addressed the issue and they disagree in their conclusions. Compare Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (holding that HALLEX is not binding on the Commissioner and allegations of noncompliance with the manual

are not reviewable) <u>with</u> <u>Newton v. Apfel</u>, 209 F.3d 448, 459 (5th Cir. 2000) (holding that a violation of HALLEX is only reversible error if the plaintiff can demonstrate prejudice resulting from the violation). Despite their disagreement on the reviewability of a violation of HALLEX rules, both the Fifth and the Ninth Circuits have determined that HALLEX is an internal agency procedure manual that does not carry the force of law. <u>See</u> <u>Moore</u>, 216 F.3d at 868-869 ("HALLEX is a purely internal manual and as such has no legal force"); <u>see also</u> <u>Newton</u>, 209 F.3d at 459 ("HALLEX does not carry the authority of law").

While the Fourth Circuit has not provided any guidance regarding the issue of whether HALLEX is judicially enforceable, other district courts from within the Fourth Circuit have adopted the Ninth Circuit's approach. <u>See</u> <u>Stephens v. Comm'r of Soc. Sec.</u>, No. 3:13-CV-03, 2013 WL 6044385, at *49 (N.D.W. Va. Nov. 14, 2013) (finding that "a failure to comply with HALLEX, if one did occur, does not mandate remand"); <u>see also</u> <u>Schrader v. Astrue</u>, No. 3:12-CV-54, 2013 WL 1192315 (N.D.W. Va. Mar. 22, 2013) (explaining that HALLEX is "an internal Social Security Administration policy manual...[that] does not impose judicially enforceable duties on either the ALJ or [the] court."); <u>Harris v. Astrue</u>, No. 2:12-CV-45, 2012 WL 7785082, at *6 (N.D.W. Va. Nov. 30, 2012) (finding that "[b]ecause HALLEX is an agency interpretation that lacks the force of law, this Court cannot force the Commissioner to follow it or provide a remedy to an claimant who avers that the Commissioner did not follow it."); <u>Allen v. Astrue</u>, No. 5:09-CV-81, 2010 WL 2196530, at *5 (N.D.W. Va. May 28, 2010) (stating that "HALLEX, as an internal guidance tool, 'lacks the force of law'") (internal citations omitted)); <u>Melvin v. Astrue</u>, 602 F.Supp.2d 694, 704-05 (E.D.N.C. 2009) (citing <u>Moore</u>, "the court rejects claimant's reliance on the ALJ's alleged failure to comply with HALLEX 1-5-4-66.").

Here, the ALJ failed to include the Exhibit List with Plaintiff's unfavorable decision as required by HALLEX I-2-1-20. The ALJ also failed to specifically state whether the record would remain open after the hearing pursuant to HALLEX I-2-6-78. However, as the above cited case law demonstrates, HALLEX does not carry the "force of law" and failure to comply with HALLEX does not require remand. Accordingly, the Court rejects Plaintiff's argument that the case requires remand based on the ALJ's failure to comply with HALLEX I-1-2-20 and HALLEX I-2-6-78.

Moreover, "[a] due process claim will not succeed…if the claimant fails to show prejudice." Mays v. Colvin, 739 F.3d 569, 573 (10th Cir. 2014) (citing Energy W. Mining Co. v. Oliver, 555 F.3d 1211, 1219 (10th Cir. 2009)). Here, Plaintiff has failed to show prejudice by the exclusion of the Exhibit List or the failure of the ALJ to specify if and how long the record would remain open. First, at the administrative hearing, the ALJ admitted the exhibits into the record, Plaintiff's counsel did not object to the admission of the evidence and counsel affirmed that he had an opportunity to review the record. (R. 44). Moreover, the ALJ's decision cites to these exhibits in a manner which allows Plaintiff determine what evidence the ALJ relied on in making her findings. See Teeters v. Astrue, No. CIV S-09-2997 DAD, 2011 WL 1135184, at *5 (E.D. Cal. Mar. 28, 2011). Second, Plaintiff failed to allege any prejudice from the ALJ's failure to specifically state that the record would remain open. While the ALJ initially stated that she was disinclined to hold the record open for what appeared to be similar or cumulative evidence (i.e., Summit Center records), she did clarify at the hearing that "[i]f you get it, obviously, you can submit it." (R. 46). Even though the ALJ did not specify if and how long the record would remain open at the end of the hearing, the hearing testimony makes clear that the ALJ would allow Plaintiff to submit new evidence. (Id.). Moreover, Plaintiff does not allege that she attempted to submit

additional medical records to the ALJ and was denied. Furthermore, Plaintiff had the opportunity to, and did indeed submit, additional evidence to the Appeals Council, which was considered and incorporated into the record. Accordingly, Plaintiff suffered no prejudice from the ALJ's alleged failure to follow HALLEX I-2-1-20 or HALLEX I-2-6-78; thus, the ALJ did not commit reversible error.

### 2. Whether the ALJ erred in his Credibility Determination

Plaintiff raises two issues in regard to the ALJ's credibility determination. First, that the ALJ failed to comply with SSR 96-7p in assessing Plaintiff's credibility and second, that the ALJ erred by utilizing boilerplate language stating she compared Plaintiff's credibility to her RFC, rather than against the entire case record. (Pl.'s Br. at 7).

### a. Whether the ALJ Properly Assessed Plaintiff's Credibility

Plaintiff contends that the ALJ's credibility analysis was based on faulty reasons and the ALJ did not articulate a rational analysis for discounting her credibility. (Pl.'s Br. at 8-9). Defendant argues that substantial evidence supports the ALJ's evaluation of Plaintiff's subjective complaints. (Def.'s Br. at 12). Defendant explains that the ALJ outlined the medical evidence that contradicted Plaintiff's allegations, noted that Plaintiff had not received the type of treatment one would expect for a totally disabled person, that the objective evidence was unremarkable and further stated that Plaintiff failed to follow up on the advice of her treating physicians, all of which undermined her credibility. (Id. at 14-15). The ALJ further supported her decision by addressing Plaintiff's conservative mental health treatment and discussing her reported daily activities that were inconsistent with her alleged debilitating physical and mental symptoms. (Id. at 15). Finally, Defendant argues that despite these inconsistencies, the ALJ gave great deference to Plaintiff's

subjective complaints by finding that she could only perform a limited range of sedentary work. (Id. at 17).

The determination of whether a person is disabled by pain or other symptoms is a two-step process. See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1); SSR 96-7p, 1996 WL 374186 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, once this threshold determination has been made, the ALJ considers the credibility of her subjective allegations of pain in light of the entire record. Id.

Social Security Ruling 96-7p sets out some of the factors used to assess the credibility of an individual's subjective symptoms, including allegations of pain, which include:

1.  The individual's daily activities;

2.  The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.  Factors that precipitate and aggravate the symptoms;

4.  The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.  Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.  Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and,

7.  Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain

specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Id. at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984). This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W.Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D.W. Va. February 3, 2010) (Seibert, Mag.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ's credibility determination is "sufficiently specific to make clear" the ALJ's reasoning in finding Plaintiff not fully credible. First, the ALJ considered whether Plaintiff had impairments capable of causing the degree and type of pain and other symptoms alleged. The ALJ found Plaintiff "has COPD/restrictive lung disease and sleep apnea," which the ALJ found to be significant breathing impairments. (R. 30). The ALJ also considered Plaintiff's mild degenerative joint disease in the right knee with baker's cyst, hypertension, metabolic syndrome and restless legs syndrome. (R. 31). In addition, the ALJ noted Plaintiff's mental impairments due to major depressive disorder. (Id.). Second, the undersigned finds that the ALJ properly discussed the factors outlined in SSR 96-7p when considering the credibility of Plaintiff's subjective allegations. The ALJ provided sufficient

reasons to support her credibility determination, including consideration of Plaintiff's treatment history, her failure to comply with her physician's recommended treatment, inconsistent work history and daily activities. (R. 32-33).

### i. Plaintiff's Daily Activities

The ALJ discussed Plaintiff's daily activities (factor one), which included Plaintiff's admissions in her Adult Function Report that she "walks her dog, is able to shower, does dishes and laundry and prepares dinner. She goes out to the grocery store or drugstore twice a week for about two hours. She also watches television and plays on the computer." (R. 32-33). In light of these daily activities, the ALJ found that Plaintiff "failed to demonstrate activities of daily living that are so limited that they would prevent her from sustaining gainful work activity within the RFC assessment." (R. 33).

Plaintiff argues that the ALJ erred because she "tried equate Ms. Pearson's ability to perform ADL's with the idea that she can perform substantial gainful activity. The credibility analysis was stained due to the ALJ's failure to address Ms. Pearson doing ADLs at her own pace." (Pl.'s Br. at 12). Plaintiff argues that she "clearly indicated that she had trouble with these activities and must perform them at her own pace." (Id. at 11). Defendant argues that the ALJ properly found that Plaintiff's daily activities were inconsistent with an individual who was experiencing debilitating physical and mental symptoms. (Def.'s Br. at 15).

Here, the ALJ properly considered Plaintiff's daily activities in weighing her credibility. See 20 C.F.R. § 404.1529(c)(3); SSR 96-7p. Despite Plaintiff's assertions, the ALJ did not "ignore" Plaintiff's subjective complaints regarding limitations associated with her daily activities. The ALJ thoroughly discussed the limitations Plaintiff asserted in her June 12, 2010 Function

Report, including experiencing pain after standing for long periods, trouble breathing, difficulty concentrating and staying focused, difficulty being around and getting along with other people, problems sleeping, difficulty dressing, problems stepping into the bathtub, limitations in walking and problems bending her right knee. (R. 29-30). The ALJ then discussed Plaintiff's hearing testimony, which again alleged limitations that would impact Plaintiff's activities of daily living including difficulty breathing, leg swelling, difficulty standing for too long, the need to elevate her legs, difficulty squatting, crouching and climbing stairs and experiencing panic attacks and depression. (R. 30).

A review of the ALJ's decision as a whole demonstrates that the ALJ properly considered Plaintiff's daily activities. The ALJ addressed Plaintiff's ability to perform some activities (i.e., walking her dog, showering, laundry, etc.), but also acknowledged Plaintiff's alleged limitations, such as difficulty standing for long periods of time, difficulty bending, squatting or crouching and shortness of breath with exertion. The ALJ then appropriately accommodated for these impairments by limiting Plaintiff to sedentary work with postural and environmental limitations. Despite Plaintiff's assertion that the ALJ "ignored" Plaintiff's complaints regarding her need to lie down or take breaks, a review of the ALJ's decision as a whole demonstrates that the ALJ did indeed consider the various complaints and limitations Plaintiff reported. Accordingly, the ALJ did not error in finding Plaintiff's activities of daily living were not "so limited" as to prevent her from sustaining gainful work activity at the sedentary level.

### ii.     Plaintiff's Pain and Other Symptoms

The ALJ also discussed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) as well as factors that precipitate and aggravate the symptoms

(factor three). The ALJ cited to Plaintiff's Function Report from June 21, 2010 as well as Plaintiff's hearing testimony, in which Plaintiff described at length her conditions and associated limitations. (R. 29-30). For example, the ALJ noted that Plaintiff reported pain in her legs that hurts more when she is up for long periods, her legs swell and itch, she has trouble breathing and gets short of breath with exertion, she has problems concentrating, staying focused and being around other people. (R. 29). As for pain, the ALJ specifically considered Plaintiff's allegations that the "pain is in her right leg," which she described as "stabbing and throbbing." (R. 30). The ALJ also discussed Plaintiff's "pain in her chest which she described as burning and crushing and worse on exertion" as well as "pain in her head which she described as aching and throbbing." (Id.). As for the fourth factor, "[t]he type, dosage, effectiveness, and side effects of any medication," the ALJ noted that "her albuterol treatments makes her shake and her Mobic upsets her stomach." (R. 30).

### iii. Plaintiff's Medical and Mental Health Treatment History

The ALJ also discussed Plaintiff's treatment for her conditions (factor five). In reviewing Plaintiff's medically determinable impairments, the ALJ discussed Plaintiff's treatment for her breathing impairments, including her treatment by Dr. Rajjoub and use of a CPAP machine at night for her obstructive sleep apnea syndrome. (R. 30). The ALJ discussed Plaintiff's mild degenerative joint disease in the right knee, which included undergoing a successful needle aspiration of the right popliteal cyst in April 2010. (R. 31). In considering these treatment records, the ALJ accommodated for Plaintiff's alleged impairments "by limiting the claimant to a reduced range of sedentary work and providing a sit/stand option in addition to other postural and environmental limitations." (Id.). The ALJ further credited Plaintiff's mental impairments even though Plaintiff "received little treatment." (Id.). Despite the limited evidence, the ALJ credited Plaintiff's

48

subjective complaints and limited Plaintiff to work involving only simple, routine and repetitive instructions and tasks, in a low stress setting, including no contact with the public and only occasionally interaction with co-workers and supervisors. (R. 32). After considering Plaintiff's medical and mental health treatment, the ALJ concluded that "claimant's treatment history does not support the claimant's allegations" because "the claimant has not generally received the type of medical treatment one would expect for a totally disabled individual." (R. 32).

Plaintiff argues that the ALJ mischaracterizes the record by discrediting Plaintiff for her perceived lack of medical treatment. (Pl.'s Br. at 9). Plaintiff asserts that the records show she sought treatment from medical specialists, such as Dr. Dubberke and Dr. Rajjoub, and she also took numerous medications for her breathing problems. (Pl.'s Br. at 9; Pl.'s Resp. at 4-5). Defendant argues that her` treatment records are "fairly sparse" and consistent of "conservative treatment, including routine examinations and prescribed medication." (Def.'s Br. at 14).

The undersigned notes that the ALJ's consideration of a claimant's type and extent of treatment is appropriate and permissible. See C.F.R. § 404.1529(c)(3); SSR 96-7p. When mentioning Plaintiff's lack of medical treatment, the ALJ specifically references Plaintiff's lack of *mental* health treatment. (R. 32) (emphasis added). The ALJ cites to Plaintiff's allegation that her lack of mental health treatment was due to a lack of insurance even though she later admitted that treatment at the United Summit Center was free and that she "stopped going 'because I didn't feel like it was helping me any. I went for a long time but I didn't like talking about all that stuff." (Id.). As such, the ALJ's statement, in context, appears to be limited to Plaintiff's lack of treatment for her mental health impairments. Indeed, the evidence includes few records indicating treatment by mental health professionals. While Dr. Dubberke diagnosed Plaintiff with depression and

prescribed anti-depressant medication, the only records by mental health professionals include those cited by the ALJ: the May 27, 2011 initial assessment at the Community Mental Health Center (R. 453), the June 28, 2011 psychiatric evaluation by Dr. Sandra Rush, and the November 1, 2012 review assessment by Sarah Howes with the United Summit Center (R. 508). The ALJ's conclusion that Plaintiff did not receive significant mental health treatment based on this record is thus supported by substantial evidence. Moreover, despite this limited evidence, the ALJ still credited Plaintiff's subjective complaints by integrating functional limitations in the RFC related to Plaintiff's mental abilities. (R. 31-32).

### iv. Plaintiff's Failure to Follow Recommended Treatment, Including to Quit Smoking

The ALJ further noted that Plaintiff "failed to follow-up on recommended treatment;" for example, she was "[a]dvised to lose weight, quit smoking, follow a 30-gram fiber diet, exercise daily, and follow-up with treatment for her depression, all of which the claimant has failed to do." (R. 32). The ALJ then discussed Plaintiff's continued tobacco use despite her doctor's recommendation that she quit and concluded that "[o]ne would reasonably expect an individual who claims to suffer from such severe, debilitating symptoms, including respiratory impairments and who is capable of financially supporting a 1-2 pack a day tobacco habit, to redirect her financial resources in an attempt to find relief." (Id.).

Plaintiff takes issue with the ALJ's consideration of her failure to quit smoking. (Pl.'s Br. at 9-10). Plaintiff asserts that the Government has recognized that a person can develop a physiological addiction to nicotine and that Plaintiff "is not less credible simply because she cannot break her physiological need for cigarettes." (Id. at 10). Defendant argues that this was just one of several factors considered by the ALJ and absent consideration of Plaintiff's continued smoking,

substantial evidence still supports the ALJ's credibility determination. (Def.'s Br. at 15-16).

In regard to drug addiction or substance abuse, the Fourth Circuit has noted that, "[f]ailure to quit smoking has been held to be a justifiable grounds for refusing benefits. However, some recent cases have held that benefits cannot be denied for failure to stop smoking absent a finding that the claimant could voluntarily stop smoking (i.e., was not addicted to cigarettes)." Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984) (internal citations omitted). The Fourth Circuit thus concluded that "[t]he Secretary may only deny the claimant benefits because of alcohol or tobacco abuse if she finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able voluntarily to stop." Id. More recently, other Circuits have held that consideration of a claimant's failure to quit smoking despite medical advice to the contrary is reasonable when assessing the claimant's credibility. See Choats v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (finding that an ALJ may properly consider a claimant's noncompliance with a treating physician's directions, including failure to quit smoking, when evaluating subjective complaints); Mack v. Comm'r of Soc. Sec., 420 F. App'x 881, 883 (11th Cir. Mar. 22, 2011), 2011 SL 989813, at *3 (finding that consideration of the plaintiff's failure to quit smoking was not an improper consideration because the ALJ did not significantly base his determination that Plaintiff was not disabled on her noncompliance with prescribed treatment and there was no dispute that substantial evidence supported the ALJ's credibility finding). A review of these cases suggests that the Commissioner may not deny benefits solely based on a claimant's nicotine addiction absent a specific finding that a claimant is able voluntarily to stop. However, a claimant's failure to quit smoking despite medical advice to the contrary may be a factor considered when weighing a claimant's credibility.

In the present case, the undersigned would be concerned if Plaintiff's ongoing nicotine addiction was the only factor used to discredit Plaintiff's credibility. However, the ALJ raised Plaintiff's failure to quit smoking despite the advice of her physicians in the context of many other factors detracting from Plaintiff's credibility regarding the severity of her symptoms. The ALJ's decision as a whole demonstrates that Plaintiff was not denied benefits solely because of her nicotine addiction. Accordingly, the undersigned finds that the ALJ's reference to Plaintiff's failure to quit smoking does not render the ALJ's otherwise thorough and well-reasoned credibility determination improper.

### v.  Measures to Relieve Pain and Other Symptoms

The ALJ also discussed factor six, "[a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms." The ALJ credited Plaintiff's testimony that "when the pain hits, she has to stop immediately and sit and put her leg up because the sharp pain takes her breath away." (Id.). The ALJ noted that Plaintiff "has been advised to elevate her legs" when her legs swell, become red and develop a rash after she has been standing for too long. (R. 30).

### vi.  Inconsistent Work History

In addition to these factors, the ALJ also noted inconsistencies regarding Plaintiff's work history. (R. 32). The ALJ pointed to instances in the record which raise questions as to whether the claimant's continuing unemployment is actually due to medical impairments." (Id.). Plaintiff argues that the ALJ is trying to "have it both ways" by finding Plaintiff did not engage in substantial gainful activity but then during the credibility analysis outline "issues" raised in Plaintiff's treatment notes regarding unsuccessful work attempts. (Pl.'s Br. at 10). Even though the ALJ considered Plaintiff's work history as undermining her credibility, this was just one factor

52

considered in addition to many others. The ALJ did not solely focus on the comments regarding work in Plaintiff's treatment notes to discredit her credibility. Accordingly, including this reasoning along with the many other well-reasoned and supportable factors does not render the credibility determination improper.

### vii. Substantial Evidence Supports the ALJ's Credibility Determination

Based on a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination as outlined above is "sufficiently specific to make clear" the ALJ's reasoning in finding Plaintiff was not fully credible. The ALJ found Plaintiff's credibility to be fair, at best, based on Plaintiff's treatment history, specifically her lack of mental health treatment, her failure to follow her doctor's recommendations, her inconsistent work history and her daily activities. The ALJ considered the factors set forth in SSR 96-7p and provided supportable and sufficient explanations for her determination to allowing the undersigned to follow her reasoning. Accordingly, the undersigned finds that substantial evidence supports the ALJ's credibility determination and the ALJ complied with the requirements of SSR 96-7p.

### b. Use of Boilerplate Language

In making her credibility determination, the ALJ used the following boilerplate language:

> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the allged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible *to the extent they are inconsistent with the above residual functional capacity assessment*.

(R. 32) (emphasis added). Plaintiff contends that the ALJ misapplied SSR 96-7p by utilizing boilerplate language stating she compared Plaintiff's subjective allegations to the RFC instead of the entire case record. (Pl.'s Br. at 7-8). In support of her argument that use of such boilerplate

language constitutes error, Plaintiff points to a district court case out of Virginia that favorably cites a Seventh Circuit case, <u>Bjornson</u>, which found the ALJ's credibility determination to be deficient because "[s]uch boilerplate language fails to inform us in a meaningful, reviewable way of the specific evidence the ALJ considered in determining that claimant's complaints were not credible." <u>Bjornson v. Astrue</u>, 671 F.3d 640, 645 (7th Cir. 2012) (citing <u>Hardman v. Barnhart</u>, 362 F.3d 676, 679 (10th Cir. 2004)). Defendant argues that "[a]lthough critical of the type of boilerplate language used by the ALJ, courts in the Fourth Circuit have nonetheless generally affirmed the ALJ's credibility assessment where, as here, the ALJ considered the evidence of record and provided sufficient support for both her RFC finding and for her credibility finding in the substance of her decision." (Def.'s Br. at 14). Defendant explains that, here, while the ALJ used boilerplate language found in many social security disability decisions, the ALJ did consider all of the evidence of record when assessing Plaintiff's credibility. (<u>Id.</u>).

In a published opinion, the Fourth Circuit recently agreed with the Seventh Circuit "that this boilerplate 'gets things backwards' by implying 'that ability to work is determined first and is then used to determine the claimant's credibility.'" <u>Mascio v. Colvin</u>, 780 F.3d 632, 639 (4th Cir. 2015) (citing <u>Bjornson</u>, 671 F.3d at 645). The Court explained that the "boilerplate also suggests that the ALJ acted contrary to the agency's rulings," specifically, Social Security Ruling 96–8p, which requires that the RFC assessment "be based on all of the relevant evidence in the case record." <u>Id.</u> The Court continued: "Thus, a claimant's pain and residual functional capacity are not separate assessments to be compared with each other. Rather, an ALJ is required to consider a claimant's pain as part of his analysis of residual functional capacity." <u>Id.</u> However, in rejecting the use of boilerplate language, the Fourth Circuit also emphasized that the use of such boilerplate

language may be harmless error "if [the ALJ] properly analyzed credibility elsewhere." Id. In Mascio, the Court went on to explain deficiencies in the ALJ's reasoning when rejecting Plaintiff's subjective statements of pain. Id. at 39-40. The Court concluded: "[n]owhere, however, does the ALJ explain how he decided which of Mascio's statements to believe and which to discredit, other than the vague (and circular) boilerplate statement that he did not believe any claims of limitations beyond what he found when considering Mascio's residual functional capacity. The ALJ's lack of explanation requires remand." Id. at 40.

In the present case, the undersigned finds that the ALJ's use of boilerplate language does not render the ALJ's credibility determination invalid. Unlike the ALJ's decision in Mascio, the ALJ's credibility determination, as outlined in detail above, demonstrates that the ALJ compared Plaintiff's subjective allegations to the entire medical record, not just to the RFC. The ALJ provided a thorough credibility analysis and provided sufficient explanation for her reasoning.

The ALJ followed both prongs of the credibility analysis as outline in Craig by first considering objective medical evidence regarding Plaintiff's medical determinable impairments, and second, considering the credibility of her subjective allegations of pain in light of the entire record. See Craig, 76 F.3d at 594. First, the ALJ included a detailed review of the objective medial evidence in identifying Plaintiff's impairments capable of causing the degree and type of symptoms alleged. (R. 29-33). The ALJ considered Plaintiff's breathing impairments, her treatment for these conditions and associated limitations (R. 30-31). The ALJ further discussed the medical evidence related to Plaintiff's mild degenerative joint disease in the right knee with a Baker's cyst, hypertension, metabolic syndrome and restless leg syndrome. (R. 31). The ALJ further assessed Plaintiff's mental impairments. (Id.). Second, the ALJ considered the credibility

of Plaintiff subjective allegations of pain and other symptoms in light of the entire case record. The ALJ specifically cited to Plaintiff's Adult Function Report from June 12, 2010 and discussed the limitations alleged by Plaintiff. (R. 29). Then, the ALJ provided a detailed overview of the conditions, symptoms and limitations asserted by Plaintiff during the administrative hearing. (R. 30). The ALJ discussed SSR 96-7p factors, including Plaintiff's treatment history, her failure to follow physician's directions, work history and daily activities as factors that detract from Plaintiff's credibility. (R. 32-33). Lastly, the ALJ weighed opinion evidence, including treating source and State Agency opinions, in determining Plaintiff's functional limitations. (R. 33).

This analysis demonstrates that the ALJ in fact considered Plaintiff's credibility in light of the entire record, not merely in comparison to the RFC. See Ashby v. Colvin, No. CIV.A. 2:14-674, 2015 WL 1481625, at *4 (S.D.W. Va. Mar. 31, 2015) (finding that the ALJ provided "specific evidence-based reasons for doubting Ashby's credibility" despite the use of boilerplate language condemned in Mascio); see also Long v. Colvin, No. 1:13CV659, 2015 WL 1646985, at *1 (M.D.N.C. Apr. 14, 2015) (finding that "Mascio is not controlling in this case" because "the ALJ looked to other factors besides Plaintiff's RFC calculation in determining the credibility of Plaintiff's statements."). Accordingly, the ALJ's use of the boilerplate language is harmless error and the use of this language does not render the ALJ's credibility determination improper. See Young v. Colvin, No. 5:13-CV-823-FL, 2015 WL 1433544, at *4 (E.D.N.C. Mar. 27, 2015) (finding that the ALJ's "use of improper boilerplate language was harmless."); see also Ngarurih v. Ashcroft, 371 F.3d 182, 190 n. 8 (4th Cir. 2004) (explaining that "[w]hile the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required

where the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.").

3.    **Whether the Appeals Council Erred in Finding Plaintiff's Newly Submitted Evidence Did Not Relate Back to the Period of Disability**

Social Security Regulations permit a claimant to submit additional evidence when requesting review by the Appeals Council. 20 C.F.R. § 416.1470(b). The Appeals Council must consider evidence submitted with the request for review "if the additional evidence is (a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins v. Sec'y, Dep't of Health and Human Servs., 953 F.2d 93, 96 (4th Cir. 1991) (citing Williams v. Sullivan, 905 F.2d 214, 216 (8th Cir. 1990)); see also 20 C.F.R. § 404.970. Evidence is new if it is not "duplicative or cumulative." Wilkins, 953 F.2d at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. In determining whether evidence relates back, "this Court has held that medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability." Wooldridge v. Bowen, 816 F.2d 157, 160 (4th Cir. 1987).

The Appeals Council "is required to consider new and material evidence relating to the period on or before the date of the ALJ decision in deciding whether to grant review." Id. at 95. After evaluating the record, including the newly submitted evidence, the Appeals Council will only grant the request for review "if it finds that the administrative law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970. If the Appeals Council rejects the request for review, the Appeals Council is not required to explain its analysis or rationale in denying the request. See Meyer v. Astrue, 662 F.3d 700, 702 (4th Cir.

2011). The Fourth Circuit has noted that "an express analysis of the Appeals Council's determination would [be] helpful for purposes of judicial review," but such an analysis is not required. Id. (quoting Martinez v. Barnhart, 444 F.3d 1201, 1207-08 (10th Cir. 2006)). After the Appeals Council considers the new and material evidence, the evidence is incorporated into the administrative record. Thus, the reviewing court "must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the Secretary's findings." Wilkins, 953 F.2d at 96.

In the present case, the Appeals Council reviewed the new evidence submitted by Plaintiff, which included two letters from Dr. Rajjoub dated February 19, 2013 and March 26, 2013. (R. 2). The Appeals Council concluded that "the ALJ decided your case through November 26, 2012. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before November 26, 2012." (Id.).

Plaintiff contends the Appeals Council mischaracterized the contents of evidence submitted to it in order to avoid addressing a treating source opinion that contradicted the ALJ's position. (Pl.'s Br. at 12). She claims the Appeals Council improperly found that two reports from her treating pulmonologist relate to a later time and therefore do not affect the decision about whether Plaintiff is disabled. (Id. at 14). Further, Plaintiff argues that the report is new because it provided opinions that had not been expressed before and material as the treating source opinion could change the outcome of the ALJ's decision. (Pl.'s Resp. at 8).

Defendant argues that the Appeals Council found that the letters did not include new medical findings and therefore did not provide a basis for changing the ALJ's decision. (Def.'s Br. at 18). Further, no additional explanation was required because the Appeals Council is not required

to articulate its reasoning in denying a request for review of an ALJ's decision. (Id.). In addition, Defendant argues that the letters at issue were neither new (as it provided a broad overview of Plaintiff's medical history which was duplicative of the medical history in the record) or material (as the disability determination is reserved exclusively to the ALJ and the physician's conclusory opinions are not material on issues reserved to the Commissioner). (Id.).

In determining that the new letters from Dr. Rajjoub related to a "later time" the Appeals Council did not provide, nor were required to provide, an explanation for their decision. See Meyer, 662 F.3d at 702. Regardless of whether the reports relate back to the period of disability, the undersigned finds that the reports are not material as there would be no reasonable possibility that the evidence submitted by Plaintiff would have changed the outcome of the ALJ's decision.

The letters from Dr. Rajjoub contain substantially similar findings as the medical records already before the ALJ. The February 19, 2013 letter merely reaffirmed Plaintiff's symptoms of chronic bronchitis, wheezing and coughing up blood and drainage. (R. 10). Dr. Rajjoub then listed Plaintiff's medications as well as her use of the CPAP machine, information that was already before the ALJ. (Id.). The November 12, 2012 Spirometry Test that he refers to showing abnormal lung function was considered and incorporated into the record by the Appeals Council but still did not rise to the level of changing the outcome of the ALJ's decision. (Id.). Accordingly, the February 19, 2013 letter is not new as the information contained in the letter was already incorporated in the record before the ALJ. In addition, the letter is not material as there is no reasonable possibility that the letter would have changed the outcome of the ALJ's decision.

Similarly, the March 26, 2013 letter and accompanying pulmonary residual functional capacity evaluation is not new and material evidence. (R. 7-9). The letter again discusses

symptoms and diagnoses already included in the record before the ALJ: chronic bronchitis, COPD, tobacco abuse and obesity. (R. 7-8). These symptoms were considered by the ALJ and found to be severe impairments based on information already in the record before her. (R. 27).

In addition to these diagnoses, Dr. Rajjoub's March 26 letter also referenced limitations in Plaintiff's ability to work. Specifically, Dr. Rajjoub opined that Plaintiff "is quite limited in her capacity to work or perform regularly physical activity." (R. 9). Further, the evaluation included numerous limitations associated with Plaintiff's abilities. (R. 12-13). For example, limitations listed by Dr. Rajjoub included sitting and standing for only thirty minutes at one time before needing to change position, sitting for no more than two hours total in a work day, standing/walking no more than two hours total in a day, never lifting more than ten pounds, occasionally lifting less than ten pounds, occasionally twisting, rarely stopping, and never crouching/squatting and never climbing ladders or stairs. (R. 14). As for environmental limitations, avoid all exposure to extreme cold, extreme heat, high humidity, wetness, cigarette smoke, perfumes, soldering fumes, solvents/cleaners, fumes, odors, gases, dust, chemicals, etc. (R. 15).

While Dr. Rajjoub's opinions regarding work limitations were not previously included in the record, the ALJ's extremely limited RFC of sedentary work with numerous postural and environmental limitations is consistent with the limitations proposed by Dr. Rajjoub. Similar to Dr. Rajjoub's opinion, the ALJ limited Plaintiff to sedentary work (i.e., lifting no more than ten pounds) with a sit/stand option allowing a person to change position for one to two minutes every thirty minutes; standing or walking no more than two hours per day; no crouching, crawling or climbing ladders ropes or scaffolds. (R. 28). The ALJ also found numerous environmental limitations as well as limitations to accommodate for Plaintiff's mental impairments. (R. 29). The

differences between the ALJ's RFC and the physical limitations opined by Dr. Rajjoub include the ALJ's finding that Plaintiff could do occasional climbing of stairs (Dr. Rajjoub said never climb stairs) and the ALJ's finding that Plaintiff could have little, if any, exposure to respiratory irritants, such as dust, flumes, odors and gases (Dr. Rajjoub found Plaintiff should avoid all exposure to such irritants). (R. 28-29). Despite these two minimal differences, a side-by-side comparison shows that the physical limitations found by the ALJ and Dr. Rajjoub are remarkably similar.

In addition, Dr. Rajjoub's opinion noted the need for Plaintiff to take breaks and time off work due to her conditions. Dr. Rajjoub found that Plaintiff would need to take unscheduled breaks every twenty to thirty minutes and rest for approximately fifteen to twenty minutes before returning to work. (R. 14). During her break, she would need to sit quietly. (Id.). Dr. Rajjoub noted that Plaintiff's impairments would produce "good days" and "bad days," but mostly bad days. (R. 15). She would likely miss more than four days of work per month as a result of her limitations and/or treatment. (Id.). Despite these inclusion of these limitations in the March 26 letter, there would still be no reasonable possibility that the letter would have changed the outcome of the ALJ's decision. Dr. Rajjoub's opinions regarding unscheduled breaks and missed work are not consistent with the evidence of record. Dr. Rajjoub's own treatment notes do not indicate the need for such breaks and such regular breaks are also not indicated by other physician's treatment notes, including Dr. Dubberke's opinion that Plaintiff could return to work in April 2011 if she wanted to. Moreover, the ALJ's sit/stand option likely accommodates Plaintiff's need to rest and sit for thirty minutes at a time before returning to work in a standing capacity. In sum, the ALJ's RFC is vastly consistent with the limitations provided by Dr. Rajjoub and is supported by the evidence of record as a whole.

Furthermore, the record before the ALJ included treating source opinions from other physicians. The ALJ specific considered the opinion of Plaintiff's treating primary care physician, Dr. Dubberke, and opinion evidence regarding Plaintiff's mental impairments. The ALJ afforded these opinions "great weight." (R. 33). Given the marked similarities between Dr. Rajjoub's opinion and the RFC adopted by the ALJ, the ALJ's consideration of treating source opinions already in the record and Plaintiff's extremely limited RFC of sedentary work with postural and environmental limitations, there is no reasonable possibility that the March 26 letter and evaluation would have changed the outcome of the ALJ's decision. Accordingly, the undersigned finds that there is no reasonable possibility that Dr. Rajjoub's letters and evaluation would have changed the outcome of the ALJ's decision. Therefore, the Appeals Council did not error in failing to consider and incorporate Dr. Rajjoub's letters in the record.

## D.     Plaintiff's Motion to Proffer Evidence

The issue before the Court is whether Plaintiff's subsequent favorable decision, finding her to be disabled a day after the ALJ's unfavorable decision, constitutes new and material evidence requiring remand. On August 27, 2014, the SSA found that Plaintiff met the medical requirements for disability benefits based on her second application. (SSA Notice, ECF No. 17-2 at 1). After filing her Complaint and Motion for Summary Judgment, Plaintiff filed a Motion to Proffer Evidence requesting that the Court admit into evidence this subsequent claim for benefits finding Plaintiff to be disabled. (ECF No. 17).

In Plaintiff's Motion to Proffer Evidence, she asks the Court to accept into evidence the Secretary's subsequent favorable finding of disability. (Pl.'s Br. Prof. at 1, ECF No. 17-1). Specifically, Plaintiff argues that the ALJ's decision cannot be supported by substantial evidence

because the Secretary found Plaintiff to be disabled on November 27, 2012, one day after the ALJ's unfavorable decision. (Id.). Plaintiff argues that there is no indication that the subsequent favorable decision was based on additional impairments or evidence; instead, the subsequent decision was based on evidence stemming from time periods predating the ALJ's decision. (Id.). Therefore, the subsequent determination is new and material evidence relating to the period of disability and remand is required to determine if the favorable decision alters the ALJ's decision. (Id.).

In response to Plaintiff's Motion to Proffer, Defendant argues that the ALJ's favorable decision in 2014 was based on additional impairments and new evidence. (Def.'s Resp. to Pl.'s Mot. to Proffer at 2-3, ECF No. 18). Moreover, a favorable decision on a subsequent application does not automatically constitute new and material evidence requiring remand. (Id.).

"When a claimant submits evidence that has not been presented to the ALJ, the court may consider the evidence only for the limited purpose of deciding whether to issue a sentence-six remand under 42 U.S.C. § 405(g)." Baughman v. Colvin, No. 5:13-CV-143-FL, 2014 WL 3345030, at *8 (E.D.N.C. July 8, 2014). Accordingly, the Court construes Plaintiff's Motion to Proffer Evidence as a request for a sentence six remand based on the existence of new and material evidence.[1] Pursuant to Title 42, United States Code, Section 405(g), a sentence six remand is warranted "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding[.]" In a sentence six remand:

---

[1] In her Reply, Plaintiff attempts to construe her Motion to Proffer as seeking something other than a sentence six remand: "while the subsequent decision itself may not be enough to constitute a Sentence Six remand, the Defendant's own subsequent alternative analysis of essentially the same evidence concerning Ms. Pearson's impairments and limitations calls into question the reasonableness of the ALJ's decision." (Pl.'s Reply at 2-3). The Court rejects this arguments and finds the Motion to Proffer is indeed seeking remand under sentence six of § 405(g). See Reichard v. Barnhart, 285 F. Supp. 2d 728, 730 (S.D.W. Va. 2003) (construing letters from the plaintiff informing the court that he was granted benefits on a subsequent application as a sentence six motions to remand).

> [t]he district court does not affirm, modify, or reverse the Secretary's decision; it does not rule in any way as to the correctness of the administrative determination. Rather, the court remands because new evidence has come to light that was not available to the claimant at the time of the administrative proceeding and that evidence might have changed the outcome of the prior proceeding.

Melkonyan v. Sullivan, 501 U.S. 89, 98, (1991).

Here, the Appeals Council denied Plaintiff's request for review on March 13, 2014 (R. 1) and the Secretary did not find Plaintiff to be disabled until August 27, 2014 (SSA Notice, ECF No. 17-2 at 1). Accordingly, the undersigned finds that there was "good cause for the failure to incorporate such evidence into the record in a prior proceeding" because the evidence was not available to Plaintiff at the time of hearing or immediately thereafter. See 42 U.S.C. § 405(g).

Next, the undersigned must determine whether the subsequent favorable decision is "a) new, (b) material, and (c) relates to the period on or before the date of the ALJ's decision." Wilkins, 953 F.2d at 95-96. As discussed previously, evidence is new if it is not "duplicative or cumulative." Id. at 96. "Evidence is material if there is a reasonable possibility that the new evidence would have changed the outcome." Id. In addition, the new evidence must also "relate[] to the period on or before the date of the ALJ's decision." Id. In determining whether evidence relates back, "this Court has held that medical evaluations made subsequent to the expiration of a claimant's insured status are not automatically barred from consideration and may be relevant to prove a previous disability." Wooldridge, 816 F.2d at 160.

Plaintiff argues that the subsequent favorable decision is new and material evidence that relates back to the period of disability because the favorable claim was based on "evidence emanating from the prior time period adjudicated by the ALJ." (Pl.'s Br. Prof. at 1). In support of her argument, Plaintiff points to Reichard and Bradley district court cases.

In Reichard, the court found the subsequent favorable decision to be new and material evidence and remanded the case. Reichard v. Barnhart, 285 F. Supp. 2d 728, 736 n. 9 (S.D.W. Va. 2003). In doing so, the court specifically considered whether the evidence relied on in the second decision was before the ALJ on the first application. Id. at n. 9 (considering whether "disability is found upon subsequent applications on substantially the same evidentiary background as was considered with respect to prior applications."). In remanding the case, the court also found that the claimant was "teetering on the edge of disability" in the initial unfavorable decision and noted that the "finding of disability commenc[ed] less than a week after he first pronounced the [c]laimant was not disabled." Id. at 734, 736 n. 9. The court found that the subsequent favorable decision may be "related and material to the question whether Claimant was disabled at any time during the period covered by the first decision." Id. at 736; see also Bradley v. Barnhart, 463 F. Supp. 2d 577, 580-81 (S.D.W. Va. 2006) (finding that "Reichard stands for the proposition that an award based on an onset date coming in immediate proximity to an earlier denial of benefits is worthy of further administrative scrutiny to determine whether the favorable event should alter the initial, negative outcome on the claim.").

In Bradley, the court similarly remanded a case for an award of benefits after finding that the second application constituted new and material evidence under Wilkins. Bradley v. Barnhart, 463 F. Supp. 2d 577, 581 (S.D.W. Va. 2006). The court first concluded that the evidence was both new and material:

> If the SSA awarded benefits on the second claim based upon the evidence received in June 2005, with an onset date coming just one day after the date of an earlier denial [April 26, 2005], that documentation, and the decision which resulted from it, would seem likely to be of a significant and substantial character in relation to the earlier claim.

Id. As for whether the favorable decision related back to the period on or before the date of the first ALJ's decision, the court found that "the medical evidence was received by the Commissioner in June 2005. It obviously existed prior to the time it was received, putting it in close temporal proximity to the April 26, 2005, unfavorable decision by the ALJ." Id. Based on these considerations, the court found that the plaintiff satisfied Wilkins and that a new-evidence remand was appropriate. Id.

In turn, Defendant points to the recent Fourth Circuit Court of Appeals case of Baker, which rejected the plaintiff's "claim that she is entitled to a sentence six remand on the basis of a subsequent administrative decision awarding benefits." Baker v. Comm'r of Soc. Sec., 520 F. App'x 228, 229 (4th Cir. 2013) (citing Allen v. Commissioner, 561 F.3d 646, 653 (6th Cir. 2009) (finding that "a subsequent favorable decision itself, as opposed to the evidence supporting the subsequent decision, does not constitute new and material evidence under § 405(g)."). The Court thus found that "Baker has not met her burden of showing that evidence relied upon in reaching the favorable decision pertains to the period under consideration in this appeal. We conclude that the evidence is not material to the earlier, unfavorable decision." Id.

Here, Plaintiff attached with her Motion to Proffer SSA documents related to Plaintiff's subsequent favorable claim; Plaintiff did not submit any new medical reports or opinions relied upon by the SSA in finding Plaintiff to be disabled.[2] As such, the undersigned carefully reviewed

---

[2] Defendant urges the Court to reject Plaintiff's motion for remand based on Baker because Plaintiff only submitted the favorable decision itself, not the evidence supporting the subsequent decision. (Def.'s Br. at 2-3). However, the Court notes that Baker is an unpublished opinion and is not binding precedent in this Circuit. 2013 WL 1866936, *1. Moreover, Baker is inconsistent with the Fourth Circuit's recent published opinion in Bird, which found that "another agency's *disability determination as evidence* of a claimant's condition." Brunson v. Colvin, No. 5:11-CV-591-FL, 2013 WL 3761305, at *2 (E.D.N.C. July 16, 2013) (citing Bird v. Comm'r of Soc. Sec. Admin., 699 F.3d 337, 343 (4th Cir. 2012) (emphasis added)). Accordingly, while Baker remains persuasive, the undersigned proceeded to assess

the SSA documents submitted by Plaintiff that accompanied her favorable decision to determine whether the subsequent favorable claim and supportive documents accompanying the claim are new and material evidence that relate back to the period on or before the date of the ALJ's decision. The undersigned finds that Plaintiff failed to meet her burden.

Many of the documents attached to Plaintiff's Motion to Proffer seek to determine the appropriate onset date for Plaintiff's award of benefits. While Plaintiff alleged she became disabled on November 15, 2010, the SSA estimated her onset date to be November 26, 2013, about one year after the ALJ hearing. (MRFC Explanation, ECF No. 23-1 at 1). However, a Request for Corrective Action was filed to address the "Decisional Deficiency Regarding Onset Date." (Request for Corrective Action, ECF No. 23-1 at 4). The SSA then found that "[t]here is an assessment in the prior file from United Summit Center dated 11/20/12, which had a similar assessment of the claimant. The evidence supports the DDS' MRFC assessment, applicable as of 11/27/12, the date after the ALJ denial." (Id. at 5). In another SSA document, the Agency stated that the United Summit Center assessment dated November 1, 2012 "paints a picture which appears to be very similar to that of the current C/E" and thus found it "would be reasonable to infer psychiatric onset" at November 27, 2012, the date after the ALJ's decision.[3] (Case Analysis, ECF No. 23-1 at 3; Explanation of Determination, ECF No. 17-2 at 2). The SSA concluded "given the totality of the evidence and the severity of the claimant's current assessment, allowance can be established as of 11/27/12." (Request for Corrective Action, ECF No. 23-1 at 5). While the

---

the merits of Plaintiff's request for a sentence six remand based on consideration of the subsequent favorable claim and accompanying documents according to the <u>Wilkins</u> standard of new and material evidence.

[3] According to the SSA's Program Operations Manual System (POMS) DI 25501.300.1, "[w]e must establish the EOD on the earliest possible date based on the evidence and our program rules."

subsequent decision found Plaintiff to be disabled just one day after the ALJ's unfavorable decision, the other factors considered in Reichard and Bradley weigh against finding Plaintiff's subsequent favorable claim to be new and material evidence that relates back to the period of disability.

First, the undersigned finds that Plaintiff's subsequent favorable decision did not rely on "substantially the same evidentiary background" as the prior decision. See Reichard, 285 F. Supp. 2d at 736 n. 9. The subsequent favorable determination directly relied on a new consultative examination from May 29, 2014. (Request for Corrective Action, ECF No. 23-1 at 5). This examination dealt with Plaintiff's mental state at that time and noted that Plaintiff "presented with severe major depression with psychotic features, generalized anxiety, OCD and panic disorder with agoraphobia. Her memory was severely deficient and concentration was impaired. Prognosis was considered poor." (Id.). The undersigned finds that it was the Agency's reliance on this new consultative examination regarding Plaintiff's mental state in 2014 that led to the award of benefits. Unlike Bradley, this consultative examination was not completed in "close temporal proximity" to the ALJ's decision; instead, the examination used to find Plaintiff to be disabled was completed more than a year and a half after the ALJ's decision. See Bradley, 463 F. Supp. 2d at 581.

Second, the evidence relied upon in reaching the favorable decision does not "pertain[] to the period under consideration in this appeal." See Baker, 520 F. App'x at 229. In addition to the new consultative examination, the SSA referenced Plaintiff's Summit Center mental assessments from November 2012 to demonstrate that her condition had "significantly declined" since the date of the ALJ's decision. The explanation accompanying Plaintiff's favorable determination notes that "the evidence indicates your condition worsened 11/27/12." (Explanation of Determination,

ECF No. 17-2 at 2). The explanation of Plaintiff's mental residual functional capacity assessment completed on August 12, 2014 by Dr. Chester Frethiem, Psy.D. states:

> Claimant appears to have had a *significant decline in her mental status* between the 6-28-11 psychiatric consultation at United Summit Center and her 5-29-14 CE with Peggy Allman, M.A. There also appears to have been a *decline in her functioning* since the 11-26-12 ALJ hearing. No documentation of her mental status is available between the 11-26-13 ALJ hearing and the 5-29-14 CE. Onset date is estimate to be 11-26-13, about one year after the ALJ hearing.

(ECF No. 23-1 at 1). The Request for Corrective Action associated with Plaintiff's second claim further states: "Psych evidence shows the claimant has a long-standing history of depression and anxiety with memory and concentration issues that have significantly declined following the ALJ hearing of 11/12." (ECF No. 23-1 at 5).

The SSA documents refer to these November 2012 reports in order to demonstrate the worsening of Plaintiff's condition following the period under consideration in this appeal. See Bryant ex rel. Fisher v. Colvin, No. 4:12-CV-195-D, 2014 WL 840727, at *10 (E.D.N.C. Mar. 4, 2014) (finding the subsequent favorable decision not material because "[t]he favorable decision…makes clear that it was based on [c]laimant's declining health subsequent to the unfavorable decision at issue in the present case."). As such, the reliance on these reports to show Plaintiff's condition declined does not mean the SSA relied the "substantially the same" evidence available to the ALJ to find that Plaintiff was disabled. Instead, the documentation accompanying Plaintiff's favorable decision repeatedly emphasized the SSA's reliance on the new May 29, 2014 consultative examination, which showed a significant decline in Plaintiff's condition since the November 2012 assessments.

The undersigned finds that the evidence relied upon by the Commissioner in finding Plaintiff disabled was not "substantially the same" evidence before the ALJ and does not "pertain[]

to the period under consideration in this appeal." See Baker, 520 F. App'x at 229; Reichard, 285 F. Supp. 2d at 736 n. 9. Accordingly, the undersigned finds that Plaintiff's subsequent favorable decision is not new and material evidence and does not relate back to the period of disability before the ALJ's decision.

## VII.   RECOMMENDATION

For the reasons stated herein, I find that the Commissioner's decision denying the Plaintiff's application for benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion to Proffer Evidence (ECF No. 17) be **DENIED**, Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 14) be **GRANTED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objections are made, and the basis for such objections. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for

Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 5th day of May, 2015.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE